**IN THE SUPREME COURT OF PENNSYLVANIA**
**WESTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| EQT PRODUCTION COMPANY AND ET BLUE GRASS CLEARING, LLC, | : | No. 4 WAP 2018 |
| | : | |
| | : | Appeal from the Order of the |
| Appellees | : | Commonwealth Court entered May 18, |
| | : | 2017 at No. 1184 CD 2016, affirming |
| | : | the Order of the Court of Common |
| v. | : | Pleas of Allegheny County, Civil |
| | : | Division, entered June 21, 2016 at No. |
| | : | SA 16-000025 and remanding. |
| BOROUGH OF JEFFERSON HILLS, | : | |
| | : | ARGUED:  October 23, 2018 |
| Appellant | : | |

**OPINION**

**JUSTICE TODD**                    **DECIDED:  MAY 31, 2019**

In this appeal, we consider the question of whether a municipality, in addressing a natural gas extraction company's conditional use application for the construction and operation of a well site, may consider as evidence the testimony of residents of another municipality regarding the impacts to their health, quality of life, and property which they attribute to a similar facility constructed and operated by the same company in their municipality.  After careful review, we hold that such evidence may be received and considered by a municipality in deciding whether to approve a conditional use application, and, thus, we vacate the order of the Commonwealth Court and remand this matter to that court, with instructions to remand this matter to the trial court for further consideration.

**I.  Factual and Procedural History**

In 2015, Appellees EQT and ET Blue Grass Clearing LLC, an affiliate of EQT (collectively, "EQT"), sought to construct, operate, and maintain a natural gas production complex on a 126-acre tract of property within the Borough of Jefferson Hills, Allegheny County ("Borough"), the Appellant in this matter. The proposed site for this facility, known as the Bickerton Well Site ("Bickerton site"), was a 29.7-acre site projected to include up to 16 "unconventional" gas wells, so described because they utilize the hydraulic fracturing production process ("fracking") to extract natural gas from a subjacent reservoir. This was to be the first unconventional well site in the Borough. According to its conditional use application filed with the Borough, the wells that EQT planned to drill would penetrate the subsurface vertically to a distance of 6,000 to 7,000 feet, and then extend horizontally for another 10,000 feet. Next to every well, impoundment ponds would be constructed, each with the capacity to store 3.4 million gallons of freshwater.[1] Additionally, all well sites were to have holding tanks for the wastewater that is returned from the well during the drilling process. Said tanks, also called flowback impoundments, which are open to the air, store the wastewater generated during the fracking process for one week, during which time a large portion of the water contained therein would evaporate into the atmosphere, after which any remaining water would be reused in the fracking process.[2]   Jefferson Township Council Decision on EQT Conditional Use Application, 12/23/15, at 19.

---

[1] This freshwater, along with sand and other friction reducing additives, is pumped at high pressure during the fracking process to fracture the rock formation holding the natural gas enabling its removal. *Robinson Township v. Commonwealth*, 147 A.3d 536, 543 n.4 (Pa. 2016).

[2] EQT's plans called for the flowback impoundments to be covered once fracking was completed at the site.

The site is located in a zoning district of the Borough designated a Business Park, which is also an Oil and Gas Development Overlay District.[3] In both districts, unconventional oil and gas well drilling is permitted by the Borough's zoning code as a conditional use. In September 2015, EQT filed an application with the Borough for conditional use approval so that it could commence construction of this facility. On October 26, 2015, the Borough Planning Commission provisionally recommended that the application be approved, contingent on EQT's furnishing to it additional detailed information regarding matters such as: notices of EQT's past violations from the Pennsylvania Department of Environmental Protection ("DEP"); the height of the structures utilized in the drilling and operation of the wells; descriptions and maps of how materials, equipment, and the water and other chemicals used in the fracking process would be transported to the site; the route through the Borough which vehicles servicing the site would take; and plans for the installation of fencing and warning signs. *Id.* at 1-2.

On November 10, 2015, the Borough Council ("Council") conducted a public hearing on the application, as required by the Municipalities Planning Code ("MPC").[4] At this hearing, eight individuals ("objectors") testified in opposition to the conditional use application. Four of the objectors were Borough residents, one of whom lived within 1,000 feet of the Bickerton site. However, three of the objectors were, at that time, residents of Union Township, Washington County, which adjoins the Borough at its southern border,

---

[3] Overlay districts, as their name implies, are zoning districts which are superimposed on a zoning map over already existing zoning districts, and feature additional land use rules beyond those governing the underlying zoning district. Jennie C. Nolon, John R. Nolon, *Zoning and Land Use Planning*, 40 Real Est. L.J. 237, 250 (2011).

[4] *See* 53 P.S. § 10913.2 ("Where the governing body, in the zoning ordinances, has stated conditional uses to be granted or denied by the governing body pursuant to express standards and criteria, the governing body shall hold hearings on and decide requests for such conditional uses in accordance with such standards and criteria.").

and were living near another unconventional natural gas well site known as "Trax Farm," which EQT had constructed and operated in Union Township since 2007 ("Trax Farm site"). Council also heard testimony from an objector who had recently moved to the Borough, but previously lived in Union Township in proximity to the Trax Farm site. As pertinent to the issue presented by this appeal, the present and former Union Township objectors gave evidence of their firsthand personal experiences with EQT's drilling and operational practices while living near its Trax Farm site, and they conveyed their perceptions of how EQT's activities at that site had negatively impacted their health and quality of life, and, also, their community's environment. Given its relevance herein, we will recount their testimony in detail.

Union Township resident Bob Domman related that because "the Trax site was probably the closest one to where I lived, we followed that pretty closely," and he testified that EQT had offered what he characterized as "gag agreements" to individuals who lived next to the site, and he provided Council with copies thereof which were entered into the evidentiary record. N.T. Jefferson Hills Council Public Hearing ("Hearing"), 11/10/15, at 138, 143. Because these individuals had apparently complained that EQT's extraction activities at the Trax Farm site constituted a nuisance which interfered with the use and enjoyment of their property, the agreements provided that, in exchange for a $50,000 cash payment, the residents would grant EQT easements and rights-of-way over their properties for "noise, dust, light, smoke, odors, fumes, soot or other pollution, [and] vibrations . . . [and other] adverse impacts or other conditions or nuisances which may emanate or be caused by [EQT's] operations." *Id.* at 139-40. These easements were for varying lengths of time, ranging from one year to perpetuity. *Id.* at 140.

Domman additionally recounted that there were loud sounds associated with the banging of large pipes as they were being loaded into the drilling rigs during the extraction

process, and, thus, he recommended that Jefferson Hills require the installation of sound walls between the drilling rigs and the three residential neighborhoods which would be nearest to the Bickerton site.[5] *Id.* at 143-44. Domman also noted that one of the pronounced features of the Trax Farm site was the storage impoundments holding the substantial quantities of water used in the drilling process, and he recalled that Union Township had sufficient concern about the quality of the water contained therein to require that it be tested. Domman further related his observations that, whenever the wells were in operation, there would be a continuous series of at least 16 or 17 heavy diesel trucks traveling back and forth over township roads hauling water to the well site, generating noticeable air pollution in the process. *Id.* at 145-46. Lastly, Domman observed that each of the 12 well pads at the Trax Farm site had condensate tanks sitting on them, which he found to be an additional source of air pollution, and cautioned that such tanks would likely accompany the wells at the Bickerton site. *Id.* at 146.

Next, Union Township resident Gary Baumgartner, whose home was located less than a tenth of a mile from one of the well pads on the Trax Farm site, testified. *Id.* at 148. He began by encouraging Council to look into local accidents in Washington County that related to EQT's drilling activities there, one of which he asserted was a blowback of drilling mud from one of its wells. According to Baumgartner, this mud flowed into Mingo Creek and the Monongahela River and encrusted the bottoms of both watercourses. *Id.* at 149. Baumgartner then related, in detail, what he perceived as the deleterious effects

---

[5] Domman estimated, based on the maps submitted with EQT's application, and aerial photographs of the area of the proposed Bickerton site and the three nearest Borough residential neighborhoods, obtained through the use of "Google Earth," that all three groups of homes were situated less than a third of a mile from the Bickerton site. N.T. Hearing, 11/10/15, at 140-41; Conditional Use Hearing Exhibits, R.R. 749-51. In its brief to our Court, the Borough adopts this estimate as accurate, Borough Brief at 19, and EQT does not dispute it.

of the fracking activities at the nearby well on both his and his family's health and quality of life during the 18-month period since it began operating. *Id.* at 150.

Baumgartner first described the intense vibrations that he and his family repeatedly endured inside of their home, as well as those experienced by his neighbors, which started once the well became operational. Baumgartner recalled that these vibrations were so powerful that, even while sitting on a couch or lying on his bed, he could feel them going through his entire body. He noted that these vibrations would routinely shake glasses of water sitting on tables or counters, and he even observed the same vibrational disturbances in the water of his neighbor's toilet after his neighbor became disturbed by the phenomenon, and, believing that the toilet was malfunctioning, requested that Baumgartner examine it. He indicated that many of his neighbors had the same experiences, and that they had shared videos and pictures with him of their household items shaking because of the vibrations. *Id.* at 150-51.

Baumgartner also told Council of the very high levels of noise which he and his family were repeatedly subjected to after the commencement of fracking activities, and which both he and his wife found made living conditions in their home intolerable. *Id.* at 156. Baumgartner testified that the noise was so intense it made it impossible for his wife to sleep in the master bedroom of their home, and that a sound monitor which was placed in that bedroom at one point registered 82 decibels, which he observed was nearly equivalent to the decibel level generated by a diesel locomotive at a distance of 100 feet. *Id.* Baumgartner related that whenever sound studies were done to assess the noise generated by the well site, drilling activities at the site were abruptly reduced, as well as the accompanying noise, such that his home again became livable. This prompted he and fellow residents to remark that they wished such studies were conducted all the time, so they could "live in peace." *Id.* at 163-64.

Baumgartner next chronicled the deterioration in air quality which he and his family experienced after fracking activities began at the well. He asserted that they repeatedly smelled strong odors of what he believed to be diesel fuel and sulfur emanating from the well site. Baumgartner recalled that one evening, as he was outside with his dog, he noticed a thick white fog enveloping the well pad and cloaking his backyard, and he remembered that it stank of sulfur. *Id.* at 156. A nonprofit public health organization, based in southwestern Pennsylvania, which became aware of the air quality concerns of Baumgartner and others who lived near the Trax Farm site, held a meeting with all of those residents and recommended that, while fracking was occurring at the well site, due to the presence of dangerous particulate matter on blades of grass, their children should not play outside, nor should residents mow their lawns without wearing a respirator. *Id.* at 152-53. Likewise, Baumgartner and the other residents were cautioned not to plant their gardens while fracking was going on. *Id.*

The nonprofit health organization also provided Baumgartner and the other residents with air quality monitors and warned them that, if the monitors read 200 or above for an hour or more, they should evacuate their homes. Baumgartner related that, at one point, his monitor registered 260, and he and his wife were forced to quickly leave their home. According to Baumgartner, this was not an isolated occurrence, as he detailed another incident which occurred on a subzero February night when the smell of diesel fuel inside his house became so strong he called the fire department. Once the fire department arrived, they recommended that he and his family immediately remove themselves from their home so they could bring in fans to blow the fumes out of their house. *Id.* at 155.

Baumgartner testified that he and his wife were forced to leave "countless times" in the middle of the night because of these type of incidents, and, at one point, he and his

wife had to stay in a hotel for two months. *Id.* at 157. Even despite taking these measures, Baumgartner recounted that he developed a serious respiratory illness that he attributed to his exposure to these fumes, and this illness necessitated his hospitalization for a five-day period, during which he was placed on a ventilator and given oxygen. *Id.* Baumgartner noted that, because of these worsened air quality levels and diesel odors, his daughter, who was 7-months pregnant at the time and living in the house with her husband, was forced to move out at her doctor's recommendation. *Id.* at 154.

Baumgartner also elaborated on his efforts to seek relief from these conditions from the DEP and the federal Environmental Protection Administration ("EPA"). He recalled that both agencies informed him that they could offer no assistance due to understaffing of their enforcement divisions and outdated laws which were ill-suited to address such events. *Id.* at 158-59.

Because of these events, Baumgartner made the decision to attempt to sell his property; however, he anticipated taking a loss on it because of all of these negative impacts from the nearby well. *Id.* at 161. He further described how a realtor informed him that, if he entered into one of the aforementioned easement agreements offered by EQT, she would not even list his house for sale. *Id.* at 162.

Mickey Gniadek, a neighbor of Baumgartner who lived across the street from one of the Trax Farm wells, testified that one night in early December 2013 he went out to get the mail, and he witnessed a thick white cloud hovering about 3-1/2 feet off the ground and surrounding the well pad. *Id.* at 167. Gniadek also encountered a strong aroma of what he believed to be chlorine permeating the air. Gniadek, who formerly worked as a truck driver hauling water to fracking sites, recalled that, while he was familiar with the various smells associated with drilling sites from his former employment, he had never experienced an odor of this nature before.

As Gniadek retrieved his mail from the mailbox, he suddenly began having intense respiratory distress, which he characterized as a feeling of great pressure in his chest. *Id.* at 168. Gniadek testified that he staggered with great difficulty back to his home, and, once inside, collapsed against the wall, gasping for air. *Id.* at 169. Eventually, Gniadek regained his breath and, because he was concerned that there had been a possible accident at the pad resulting in a chemical discharge, as well as possible injury or loss of life to workers at the site, he called one of EQT's representatives, who ostensibly was responsible for its supervision. *Id.* at 170.

Gniadek testified that the individual whom he talked to on the phone was dismissive of his concerns and, at one point, laughed at him after he raised the prospect of injured workers being present at the well pad. *Id.* at 171. After further exchanges, the individual Gniadek spoke with eventually said he would call to the site to see if there were any reports of problems, but Gniadek heard nothing further from him, or anyone else at EQT, about the incident. *Id.* at 171-72. Once Gniadek ended the phone call, he became very alarmed as he observed that his face, hands, and body were covered with red spots that resembled measles. *Id.* at 172-73.

Gniadek recounted that, after the incident, a subcontractor of EQT appeared at his house to offer him $50,000, which he was told he would receive only if he and all of his neighbors signed an agreement that the subcontractor presented to him. Gniadek recalled that the contract prohibited the signatory from asserting any past or present claims against EQT, including health ones. *Id.* at 173. Gniadek, because of his concern over his breathing difficulties and the unexplained red dots that appeared on his body after inhaling the acrid fumes, declined to do so. He informed the subcontractor that he was not signing any such agreement until he was given a satisfactory explanation as to the cause of his skin outbreak. *Id.* at 179-80. The subcontractor left, but returned a week

later and told him that the agreement was now available to him on an individual basis. *Id.* at 174.

Gniadek also testified that vapor recovery units which had been installed on the well pad ran 24 hours a day and generated considerable noise, which was clearly audible to him at his house, along with the sounds the workers at the well pad made during their activities there. *Id.* at 176. Gniadek echoed Baumgartner's observation that the general noise level at the well site would abate considerably during the time periods in which sound studies were being conducted. *Id.* at 176-77.

Lastly, former Union Township resident, and current Jefferson Hills resident, Andy Tullai detailed his experiences living near the Trax Farm site. He too recalled how he was disturbed in his home by sounds emanating from the well pads. Not only did he experience the high decibel noises that Baumgartner related, but he recounted that his home was subjected to constant, steady low frequency sounds emanating from the well site which permeated his entire house and disturbed his sleep. *Id.* at 183. He also told of being annoyed on certain nights by the intense banging of pipes and other equipment, as well as sledgehammering, when drilling rigs were moved from well to well. *Id.*

Tullai additionally described how lights erected at the site at the beginning of the drilling process, which EQT eventually moved at his request, were so bright he could read a newspaper at night in his backyard. What Tullai remembered to be most upsetting to him, annoying him to the point of tears as he put it, was the intense smell of diesel exhaust fumes, which he said would frequently invade his house. *Id.* at 184. These experiences motivated Tullai to move out of his home and relocate to the Borough.[6] EQT presented no rebuttal or explanatory evidence in response to objectors' testimony.

---

[6] The four objectors who were Borough residents respectively testified to, *inter alia*: fines assessed against EQT for its drilling practices in Tioga County, general fracking industry practices, scientific research done about the hazards of the chemicals used in the fracking

On December 14, 2015, Council unanimously voted at a public meeting to deny EQT's application. In its written decision, Council credited all of the testimony it heard at the public hearing during the public comment portion, and it found the persons testifying to be "credible and persuasive." Jefferson Township Council Decision on EQT Conditional Use Application, 12/23/15, at 25. Accordingly, Council indicated that it gave their testimony "significant weight." *Id.*

In deciding whether EQT had met its requisite burden of proof to be granted a conditional use, Council first recited what it perceived as the relevant law articulated by the Commonwealth Court regarding the respective burdens of proof of an applicant for such a use and those objecting to its approval:

> An applicant is entitled to a conditional use as a matter of right, unless the governing body determines that the use does not satisfy the specific, objective criteria in the zoning ordinance for that conditional use. The applicant bears the initial burden of showing that the proposed conditional use satisfies the objective standards set forth in the zoning ordinance, and a proposed use that does so is presumptively deemed to be consistent with the health, safety and welfare of the community. Once the applicant satisfies these specific standards, the burden shifts to the objectors to prove that the impact of the proposed use is such that it would violate the other general requirements for land use that are set forth in the zoning ordinance, *i.e.,* that the proposed use would be injurious to the public health, safety and welfare.

*Id.* (citing *In re Drumore Crossings, L.P.*, 984 A.2d 589, 595 (Pa. Cmwlth. 2009)).

Council found that EQT's application met the general standards for the grant of a conditional use enumerated in Section 1003(b)-(f) of the Borough's Zoning Ordinance, as well as the specific requirements set forth in the Borough's Zoning Code for a natural gas facility to operate as a conditional use in both a Business Park and Oil and Gas

---

process, and the health effects of fracking on those living near well sites. Jefferson Township Council Decision on EQT Conditional Use Application, 12/23/15, at 20-23.

Development Overlay zoning district. However, Council found that there existed "evidence in the record that permitting the proposed natural gas production facility as a conditional use does not protect the health, safety and welfare of the Borough and its residents as required by the objective standards of the Borough Zoning Ordinance Section 1003(a)."[7] Jefferson Township Council Decision on EQT Conditional Use Application, 12/23/15, at 26. As a result, Council concluded that "pursuant to Pennsylvania case law, [EQT] [has] not met [its] burden of proof for a conditional use application and the burden never shifted to the objectors to prove that the impact of the proposed use is such that it would violate the other general requirements for land use set forth in the Borough Zoning Ordinance." *Id.* Council further noted in its decision that the fact that the burden of proof never shifted to the objectors did not preclude its consideration of evidence received at the public hearing from the objectors, which concerned how EQT did not meet its burden "related to the proposed use's effects upon the health, safety and welfare as well as the potential deterioration of the environment." *Id.*[8]

---

[7] This ordinance provides, in relevant part:

> In addition to the specific standards and criteria listed for each use in Section 1004 below, all applications for conditional uses and uses by special exception listed in each Zoning District shall demonstrate compliance with all of the following general standards and criteria:
>> (a) The use shall not endanger the public health, safety or welfare nor deteriorate the environment, as a result of being located on the property where it is proposed.

Borough of Jefferson Hills Zoning Ordinance § 1003(a).

[8] Additionally, Council went on to consider EQT's application under the Environmental Rights Amendment to the Pennsylvania Constitution. This alternative rationale for denying EQT's conditional use application is not before us in this appeal; hence, we will not opine to it.

EQT thereafter appealed Council's decision to the Court of Common Pleas of Allegheny County. The trial court, Senior Judge Joseph M. James, reversed, without taking additional evidence. The court noted that, under what it considered to be the relevant legal standard for determining whether a developer is entitled to conditional use approval, the developer has the initial burden of proving by a preponderance of the evidence that its proposed use is the nature and type of conditional use described in the zoning code, and, also, that the proposed use complies with the other specific requirements of the zoning ordinance. The court opined that, once the developer makes these showings, the burden then shifts to those objecting to the use to prove the proposed land use will have an adverse effect on the general public, *i.e.*, demonstrate with "a high degree of probability" that the proposed use will pose a substantial threat to the health, safety, and welfare of the public. Trial Court Opinion, 6/21/16, at 3 (quoting *Bray v. Zoning Bd. of Adjustment*, 410 A.2d 909, 914 (Pa. Cmwlth. 1980)).

The trial court concluded that EQT complied with the specific requirements of the zoning ordinance for this type of conditional use, inasmuch as Council found that EQT met all the requirements of the Borough's Zoning Ordinance which governed the grant of conditional use approval for oil and gas drilling facilities; thus, in the court's view, the burden of proof shifted to objectors to show that this proposed use would have adverse effects on the general public. The court found that objectors did not meet this burden, characterizing their testimony as being "speculative regarding general oil and gas development," and raising only "theoretical concerns about air pollution and odors." Trial Court Opinion, 6/21/16, at 4. Consequently, the court reversed Council's decision denying the conditional use application. The Borough appealed this decision to the Commonwealth Court.

A panel of the Commonwealth Court affirmed in a divided, published opinion authored by President Judge Emeritus Bonnie Brigance Leadbetter. *EQT v. Borough of Jefferson Hills*, 162 A.3d 554 (Pa. Cmwlth. 2017)*.* The majority began by observing that a conditional use is not an exception to a municipality's zoning ordinance, but, rather, is a use to which an applicant is entitled as a matter of right, unless the municipal legislative body determines "that the use does not satisfy the specific, objective criteria in the zoning ordinance for that conditional use." *Id.* at 560 (quoting *In re Drumore Crossings, supra*). The majority stated that the applicant seeking conditional use approval has the burden of persuasion to establish that its proposed use satisfies the objective requirements enumerated by the relevant zoning ordinance governing conditional uses. Once an applicant meets this *prima facie* burden, then it "is entitled to approval, unless objectors in the proceeding offer credible and sufficient evidence that the proposed use would have a detrimental impact on public health, safety, and welfare." *Id.* (quoting *Williams Holding Group, LLC v. Board of Supervisors of West Hanover*, 191 A.3d 1202, 1212 (Pa. Cmwlth. 2014) (internal quotation marks omitted)). The majority characterized the nature of objectors' burden in this regard as proving, with a high degree of probability, that allowing the conditional use will create a substantial risk of harm to the community — *i.e.*, that it "will impose detrimental impacts exceeding those ordinarily to be expected from the use at issue." *Id.* at 561.

The majority found that, because EQT had met its initial burden of complying with the requirements of the zoning ordinances governing conditional uses, the burden of proof shifted to objectors to show with a high degree of probability that EQT's proposed well site would cause detrimental impacts that exceed those which would be ordinarily expected from unconventional gas wells. *Id.*

Reviewing the testimony of the objectors at the public hearing, the majority concluded it was insufficient to carry this burden. The majority deemed objectors' testimony about problems at the Trax Farm site and the general harms posed by drilling activities and operation of unconventional wells insufficient to prove that the development of the Bickerton site would have a negative impact on the public health, safety, and welfare which was greater than that normally associated with any other unconventional well site. The majority agreed with the trial court's characterization of objectors' testimony as "speculative." *Id.* at 563.

Further, the majority declared that, "[w]hile such testimony might persuade legislators to prohibit such drilling, it does not satisfy [objectors'] burden to show that the development of the Bickerton Well Site would have an impact on public health, safety, and welfare." *Id.* The majority added that, "given the fact that there has been a legislative decision that the particular use is presumptively consistent with the health, safety, and welfare of the community, the objectors' testimony is insufficient to satisfy their burden, and it is not the role of the Council in adjudicating a conditional use application . . . to second guess the legislative decision underlying the ordinance." *Id.* The majority denied that it was adopting a *per se* rule precluding the testimony of lay witnesses to establish that a conditional use was a danger to the public health, safety, and welfare; rather, the majority asserted that it was holding that such lay testimony cannot merely address the general risks posed by the proposed use, or be speculative in nature. *Id.* at 563 n.10.

Judge Patricia A. McCullough dissented. She noted that, as a general proposition, whenever an applicant seeks conditional approval for what is a novel use of land within municipal boundaries, it is difficult for objectors to demonstrate that it will have a negative impact on the health, safety, and welfare of the community, as they have not, heretofore, had any firsthand experience with the particular use; thus, they are normally forced to

speculate as to the possible negative consequences which might ensue from approval of the conditional use. However, Judge McCullough disagreed with the majority's conclusion that objectors' testimony in this instance constituted such speculation. While she acknowledged that the Commonwealth Court has consistently held that objectors' testimony of a generalized fear that construction of a proposed facility will result in harm is insufficient to satisfy their burden of proof, Judge McCullough found such caselaw distinguishable because, in her view, objectors' evidence was specific and concrete, and established that EQT's similar Trax Farm site had marked detrimental effects on adjoining residents of a neighboring municipality.

Judge McCullough found support for the evidentiary relevance of individuals' firsthand experiences with similar proposed uses from our Court's decision in *Visionquest National Limited v. Board of Supervisors of Honey Brook Township*, 569 A.2d 915 (Pa. 1990). In that decision, we held that, while an objector's bald assertions, personal opinions, and speculation will not suffice to prove detrimental impact on a community from a proposed development project, testimony by individuals regarding specific past experiences with the proposed use can be used to satisfy an objector's burden of proof that a proposed conditional use poses a significant risk of harm to the community. *Id.* at 917-18.

Judge McCullough opined that, although our holding in that case found only prior incidents occurring at the same facility relevant for the purpose of bolstering the objectors' challenge, neither this Court, nor the Commonwealth Court, has ever considered whether *Visionquest* can be extended to cases where the objectors' testimony is based solely upon effects experienced at a different, albeit similar, facility located in an adjoining municipality. Even so, Judge McCullough reasoned that logic and fairness dictate that such an extension of our holding in *Visionquest* should apply in this case, particularly

where there is no similar unconventional gas well facility located within the Borough with which to compare the proposed Bickerton site.

Additionally, she criticized the majority's determination that objectors were limited to presenting evidence specific to the Bickerton site as being unduly restrictive and impracticable, resulting in the imposition of a nearly insurmountable burden on them of proving detrimental harm. Adding that, had objectors hired an expert, that expert would likely have had to rely on comparative data from other well sites to support his or her opinion, in her view, an independent expert opinion was of little value in this matter.

Judge McCullough repudiated the majority's view that the testimony provided by the Union Township residents as to their own experiences living near the Trax Farm site was incompetent or inadmissible as a matter of law. By contrast, she concluded that it was within Council's province, as fact-finder, to infer that the same negative effects complained of by the residents who lived near the Trax Farm site would likely occur near the Bickerton site if the conditional use was granted. *EQT*, 162 A.3d at 569 (McCullough, J., dissenting).

The Borough filed a petition for allowance of appeal with our Court, which we granted in order to consider the following issue, as framed by the Borough:

> Whether the Commonwealth Court erred as a matter of law by imposing a standard upon the admissibility of objectors' evidence that effectively eliminates the ability to raise any objection to a land use application based on firsthand experience with a similar use when the proposed use does not already appear within municipal borders?

*EQT v. Borough of Jefferson Hills*, 179 A.3d 454 (Pa. 2018) (order).

## II. Arguments

The Borough argues that the effect of the Commonwealth Court decision is to establish a "draconian" standard for the admissibility of testimony at a land use hearing that excludes otherwise probative, relevant, and credible evidence furnished by witnesses

with firsthand knowledge of how an applicant has previously conducted the land use activity. Borough Brief at 15. The Borough criticizes the Commonwealth Court for summarily dismissing the testimony of the witnesses from Union Township who lived near the Trax Farm site as "speculative" on the grounds that it was not specific to the Bickerton site, particularly when, at the time of the application, no unconventional drilling activity had ever taken place within the Borough. The Borough asserts that the testimony of the Union Township residents regarding the operation of the Trax Farm site was highly relevant to their burden to show that the proposed Bickerton site would adversely affect the health, safety, and welfare of the residents of Jefferson Borough, given that the Trax Farm site was "similar" to the proposed Bickerton site, and Union Township and Jefferson Borough share a common municipal border. *Id.* at 16.

The Borough claims that the Commonwealth Court's requirements for the testimony of witnesses at a land use hearing — *i.e.,* requiring them to connect such testimony to the particular future proposed land use by the applicant within the municipality, while prohibiting them from analogizing the proposed use to past similar uses outside of the municipality — are both unjustified and unworkable in situations where the land use is a novel one for the municipality.

The Borough asserts that such restrictions on witness testimony also intrude on the province of a local governing body to function as a finder of fact when considering a land use application, as it interferes with its duty to evaluate and assess the credibility of all relevant evidence in order to guard against unwarranted approval of a land use that will negatively affect the health, safety, and welfare of its citizens. According to the Borough, the testimony of the Union Township residents as to their firsthand experiences with the noise and pollution generated by the Trax Farm site was highly relevant to its

fact-finding process, as it described recent harmful impacts on residents of a bordering municipality from the very same type of development which EQT was proposing.

The Borough emphasizes that EQT, which was represented by counsel at the public hearing, did not cross-examine the Union Township residents, nor did it present any evidence to counter their testimony. Consequently, the Borough points out, Council was faced with a situation where it had heard uncontradicted evidence from witnesses, who Council deemed credible, about the detrimental effects caused by EQT's operation of a facility similar to the one it sought to construct in the Borough, yet, under the Commonwealth Court's holding, they would be required to ignore this evidence. This, in the Borough's view, essentially eliminates an objector's ability to challenge land uses by utilizing evidence of an applicant's past conduct, and undermines the ability of a local governing body to examine past practices of an applicant in order to ensure the protection of the health, safety, and welfare of its citizens. In essence, argues the Borough, an evidentiary rule that excludes evidence of past similar practices in other municipalities grants applicants a "free pass" simply because they are proposing a land use for the first time in a community. Borough Brief at 28.

Further, the Borough notes, in considering an application for drilling an unconventional well, the DEP is required to consider evidence of the driller's past conduct and to deny the application if the driller remains in violation of the law. The Borough contends that this demonstrates the probative evidentiary value of past conduct by a driller such as EQT. Moreover, the Commonwealth Court's rejection of such firsthand testimony, the Borough asserts, runs contrary to prior caselaw from that court which favorably regards testimony from witnesses as to their personal experiences with the current operations of an applicant for zoning approval for a planned use. *Id.* at 25 (quoting *Pennsy Supply v. Zoning Hearing Board of Dorrance Township*, 987 A.2d 1243, 1250

(Pa. Cmwlth. 2009) (holding that testimony of residents who lived near a quarry about the adverse effects they had suffered from its operation was not speculative since "it was based upon the experiences they have had with [the quarry's] current operations.")).

Additionally, in the Borough's view, the Commonwealth Court's decision will have far reaching implications beyond conditional use applications, as it will affect the ability of local governing bodies to grant conditional approval for a proposed use based on the applicant meeting certain conditions. The Borough maintains that the ability of such bodies to consider evidence of an applicant's past practices is crucial to their ability to identify areas of concern that they wish an applicant to address, or to attach conditions tailored to avoid practices that endanger the health, safety, and welfare of the community.

The Borough agrees with Judge McCullough's dissent that our Court's holding in *Visionquest* should govern the outcome of the case at bar. The Borough argues that the testimony at issue in that case — from residents of a municipality where an applicant sought zoning approval to continue to run a facility housing troubled juveniles about their personal experiences with how the facility actually functioned — was regarded by our Court as not speculative, but, instead, entitled to considerable weight in assessing whether the facility's continued use would be a detriment to the community. The Borough adopts Judge McCullough's view that the rationale of that case rests on "the unstated presupposition that what has happened (or more appropriately, 'experienced') in the past is competent evidence of what will continue to happen in the future." Borough Brief at 27 (quoting *EQT*, 162 A.3d at 566-67 (McCullough, J. dissenting) (internal quotation marks omitted)).[9]

---

[9] *Amicus*, the Pennsylvania State Association of Boroughs, has filed a brief in support of the Borough which chiefly tracks its arguments. Additionally, however, *Amicus* avers that the Commonwealth Court in this matter contravened its prior precedent by placing the ultimate burden of proof on the objectors to show that the particular land use they are challenging will cause a substantial threat to the health, safety, and welfare of the

In its response, EQT contends that the Borough mistakenly views the Commonwealth Court's ruling as addressing the admissibility of the objectors' evidence. EQT contends that the Commonwealth Court did not hold that the objectors' evidence was inadmissible; instead, it held that the evidence was legally insufficient for objectors to meet their burden of production. EQT highlights that the Commonwealth Court was tasked with determining whether Council's decision to deny its conditional use application was supported by substantial evidence. In EQT's view, the court determined that, even though Council accepted the witnesses' testimony as credible, the evidence was, due to its nature, insufficient as a matter of law to meet the objectors' burden of production, and, thus, Council's decision was not supported by substantial evidence. EQT Brief at 18 (quoting *EQT*, 162 A.3d at 563 ("Having carefully reviewed the objectors' testimony, we conclude that it is insufficient to meet their burden of proof.")).[10]

_____

community. *Amicus* asserts that, under prior decisions of that court, *Butler v. Derr Flooring*, 285 A.2d 538 (Pa. Cmwlth. 1971), and *Bray v. Zoning Hearing Board of Philadelphia*, 410 A.2d 909 (Pa. Cmwlth. 1980), if an objector to a proposed use comes forth with evidence that it would violate the health, safety, and general welfare of the community, then the burden of proof remains with the applicant to show that the intended use would not pose the danger to the community which the objector claims.

[10] The concepts of burden of production and burden of proof do not mean the same thing in the context of a hearing on a conditional use application. The Commonwealth Court has previously explained that, if a Borough's zoning ordinance explicitly places the burden of proof on an applicant for a conditional use exception to demonstrate that the proposed land use would not detrimentally affect the health, safety, and general welfare of the community, the applicant has the initial burden to produce evidence, and also to prove, that its proposed use meets all of the specifications and requirements provided by the Borough's zoning code for the grant of a conditional use. *Butler*, 285 A.2d at 542; *Bray*, 410 A.2d at 912. At that point, the objectors have a burden to produce evidence showing that the proposed development would have a detrimental effect on the health, safety, and welfare of the community. If the objectors produce such evidence, the applicant must then prove "that the intended use would not violate the health, safety, and general welfare of the community with relation to such objections." *Butler*, 285 A.2d at 542; *Bray*, 410 A.2d at 912 (internal quotation marks omitted).

If, on the other hand, the zoning ordinance does not specifically assign the burden of proof regarding the question of whether a conditional use will be a detriment to the health, safety, and welfare of the community to the applicant, and the applicant has

EQT then turns to its main argument that "[t]he Commonwealth Court correctly concluded that the objectors' evidence was not sufficient to meet their burden of production to challenge EQT's conditional use application." EQT Brief at 18. EQT contends that, as the Commonwealth Court below found, the objectors were required to demonstrate a high probability that the use in question will generate adverse impacts exceeding that normally generated by this type of use and that these impacts pose a substantial threat to the health, safety, and welfare of the community. *Id.* at 20 (citing *In re Cutler Group*, 880 A.2d 39 (Pa. Cmwlth. 2005); *Oasis v. Zoning Hearing Board of South Annville Township,* 94 A.3d 457 (Pa. Cmwlth. 2014)). Moreover, EQT maintains that, under the Borough's Ordinance, objectors were also required to present evidence that the use would endanger the public's health, safety, and welfare "as a result of being located on the property where it is proposed." *Id.* at 20 (quoting Borough of Jefferson Hills Zoning Ordinance § 1003(a)). EQT argues that the Commonwealth Court correctly found that objectors did not meet these burdens.

EQT notes that some of the objectors from the Borough gave testimony only regarding the impact of oil and gas operations on public health, generally, and that the two objectors who lived near the proposed Bickerton site offered no evidence at all, but merely asked questions at the hearing. As for the testimony of the objectors from Union Township, though they described their own experiences with the Trax Farm site, they gave no testimony relating to the Bickerton site, nor did they assert that their experiences with the noise, light, and odors emanating from Trax Farm were somehow abnormal in

proved that he or she has complied with all of the specific conditions and requirements of the zoning ordinance, the burden of production and proof regarding detriment shifts to the objectors. *Marquise Investment, Inc. v. City of Pittsburgh,* 11 A.3d 607, 611 (Pa. Cmwlth. 2010). Although we did not grant allowance of appeal to speak to this aspect of the case, it is evident that the parties and the Commonwealth Court have differing views regarding the proper allocation of the burdens of production and proof in this matter.

relation to other oil and gas operations. Therefore, according to EQT, the Commonwealth Court properly found objectors' evidence did not meet their burden, as it was merely generalized and speculative in nature.

Regarding the Borough's assertion that evidence of EQT's past practices in neighboring Union Township was necessary because there was no oil and gas development in the Borough, EQT suggests that objectors could have offered expert testimony. EQT points out that such testimony could have addressed the suitability of the Bickerton site, highlighting unique characteristics of the site that would have made it unsuitable for unconventional drilling, or expert testimony that showed that such drilling would likely cause detrimental health and safety effects on nearby residents; instead, objectors relied on the general speculative testimony of their witnesses.

EQT also suggests that such lay testimony is proper only when, as in *Pennsy Supply*, *supra*, the testifying witnesses have personal experience with the use in question because it occurred at the site of the proposed future land use. EQT proffers that, by contrast, none of the witnesses who testified to their experiences with the Trax Farm site were qualified to render an expert opinion regarding potential community impacts from the Bickerton site, or whether EQT's operations there would comport with the Borough ordinance.

EQT finally contends that the Borough already considered potential environmental impacts of oil and gas drilling when it approved such drilling as a conditional use. EQT reasons that the Borough's further purported reliance on potential adverse environmental effects in denying EQT's application was irrelevant, as those concerns had already been addressed through the adoption of the standards contained in the ordinance. Thus, EQT

views the Board's denial of its application as an improper effort to rewrite its ordinance without following the mandatory procedures for doing so set forth in the MPC.[11]

### III. Analysis.

We begin our discussion by noting our standard of review of a municipality's denial of a conditional use application. Our review is limited to determining whether the municipality abused its discretion, or committed an error of law in denying the application. *Visionquest*, 569 A.2d at 918. An abuse of discretion will be found whenever the findings of the governing body are not supported by substantial evidence. *Id.* Substantial evidence is defined by our Court as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Gorsline v. Board of Supervisors of Fairfield Township*, 186 A.3d 375, 385 (Pa. 2018). Our review of whether the governing body committed an error of law is, as with all such determinations, conducted *de novo* and, thus, we are not bound by the legal conclusions of the governing body or lower courts. *Id.*

---

[11] *Amicus*, the Pennsylvania Independent Oil and Gas Association ("PIOGA"), has filed a brief in support of EQT. *Amicus* argues that this case implicates the fundamental right of every individual to own and use his or her private property in the manner they see fit. Inasmuch as zoning laws represent a restriction on that right, *Amicus* propounds that, if a zoning code allows for a particular use if its specific criteria are met, then it is a legislative determination that the use is one which will not interfere with the health, safety, or welfare of the community. Hence, in the view of *Amicus*, a landowner has the unquestioned right to use his or her property in the manner permitted by the zoning ordinance if he or she has met all of its requirements. *Amicus* contends that, under such circumstances, "a landowner *must* be granted a zoning approval if he satisfies the objective criteria of the ordinance." PIOGA Brief at 10 (emphasis original). According to PIOGA, it is only whenever an objector to the proposed use can demonstrate a high degree of probability that the use in question will cause a detrimental impact on the public health, safety, and welfare that infringement of the landowner's property right will be constitutionally permissible.

While conceding that this issue is not before our Court, PIOGA also attacks the Borough's reliance on Article I, Section 27, contending that this provision is not self-executing, and thus cannot be applied to applicants for a conditional use exception, as it would effectively supersede the MPC, which it views as is the only source of legal authority for a municipality to act in these matters.

The issue which we accepted for review is one of evidentiary admissibility — *i.e.*, whether the testimony of the residents of a municipality regarding their firsthand experiences with the manner in which a particular land use was conducted by the owner of property in very near proximity to their own homes was admissible in a hearing held in another municipality on a land use application to conduct a similar land use there. Contrary to EQT's assertion, we do not read the Commonwealth Court's majority opinion as being merely a sufficiency of the evidence analysis; rather, the panel majority endorsed the trial court's sweeping characterization of the nature of the testimonial evidence at issue as "speculative." *EQT*, 162 A.3d at 563. Such a dismissive pronouncement regarding the general nature of this type of evidence gives credence to the Borough's concern that the panel decision in this matter will be interpreted as a categorical bar to the admissibility of this type of firsthand experiential evidence in future conditional use hearings.

Turning to the merits of the question that this Court granted allowance of appeal to address, we note that local agencies are not bound by technical rules of evidence when conducting hearings. 2 Pa.C.S. § 554. Instead, they are empowered to consider "all relevant evidence of reasonably probative value." *Id.* The need for such flexibility in matters of evidentiary admissibility is heightened in conditional use hearings conducted by local municipalities, which have the paramount duty to protect their residents from harm to their persons and property, due to the fact that such land uses present the possibility that the property rights of neighboring landowners will be affected. *Luke v. Cataldi*, 932 A.2d 45, 54 (Pa. 2007).

In determining whether the evidence provided by the Union Township objectors was relevant and of reasonably probative value in the Jefferson Borough conditional use hearing, we are guided by the fundamental legal tenet that evidence will be deemed

relevant if it "logically tends to establish a material fact in the case, tends to make a fact at issue more or less probable, or supports a reasonable inference or presumption regarding the existence of a material fact." *Commonwealth v. Johnson*, 160 A.3d 127, 146 (Pa. 2017); *Commonwealth v. DeJesus*, 880 A.2d 608, 615 (Pa. 2005). The probative value of evidence is measured by the tendency of the evidence to establish the proposition that it is offered to prove. 1 McCormick On Evidence. § 185 (7th ed. 2016).

As a general matter, our Court has recognized the relevancy and probative value of an applicant's past conduct in determining whether he meets the conditions of licensure for conducting future business activities of the same nature as those in which he had previously engaged. *See Street Road Bar and Grille v. Pennsylvania Liquor Control Board*, 876 A.2d 346, 357-58 (Pa. 2005) (holding that prior instances of conduct of liquor license applicant, including liquor code violations, was both relevant and "extremely probative" in determining whether applicant met the statutory criteria for being reputable, given that this history was an accurate gauge of whether the applicant had the requisite degree of fitness required to operate a liquor selling establishment). Of greatest pertinence to the issue we are considering, in the context of a hearing on an application for conditional use approval, our Court has regarded evidence relating to past conduct and practices of a facility's owners, and specific impacts on the community from the functioning of the facility, to be relevant and probative in determining whether, if conditional use authorization were granted, the facility's operation would pose a threat to the welfare of the community.

In *Visionquest*, *supra*, the applicant sought conditional use approval from a municipality to continue operation of a rehabilitative facility which housed youths with behavioral difficulties. This facility had already been operating within the municipality prior to this conditional use approval being sought. At the hearing on the application held by

the municipality's governing body, residents of the municipality testified regarding incidents occurring at the facility that disrupted their lives — namely, obscenities and loud noises emanating from it every morning. Residents also detailed their apprehension about the potential for escapes occurring from the facility, as well as their fears that escapees would cause property damage. Evidence was presented to the governing body that such escapes had already occurred when the facility was operating in an unlicensed manner, and that, during the time searches were underway for the escapees, the facility's operators advised them of the necessity to take precautions. Additionally, the governing body received evidence that a similar facility operated by the same owners in another county had sustained property damage, and that the owners had expressly disclaimed responsibility for any property damage caused by escapees. Based on this evidence, the governing body denied the conditional use application on the grounds that it did not meet the objective criteria of the zoning ordinance governing the grant of a conditional use permit, and that, even assuming *arguendo* that it did, denial would have been justified because the proposed use "would have a detrimental effect on the welfare of the community." *Visionquest*, 569 A.2d at 916-17.

In reviewing the denial, the trial court found that the applicant had met the criteria established by the zoning ordinance for the grant of the conditional use exception. However, the trial court, relying on the evidence relating to the facility's operations inside the township, and the incidents of property damage arising out of the operation of a similar facility in another county, upheld the denial. The court found that this evidence supported a finding that denial was warranted because of detriment to the community. *Id.* at 917. The Commonwealth Court reversed on the basis that the evidence constituted only "unsupported anxieties" and established only "the mere possibility of an adverse impact," which was insufficient to establish detriment. *Id.*

Our Court, in turn, reversed the Commonwealth Court ruling. We determined that the evidence received by the governing body, detailed above, including that provided by the residents of the community regarding how the facility impacted their day-to-day lives while it was in operation, was sufficient to enable the objectors to demonstrate detriment. We expressly rejected the Commonwealth Court's conclusion that this testimony constituted only "bald assertions," or "unsupported anxieties," because the residents' testimony was based on their own firsthand experiences with the operation of the facility.

Although the facility at issue in *Visionquest* was located within the community in which it sought to continue its operation, we discern no reason why that decision's underlying rationale — that firsthand experiences with a particular type of land use by people living near it are relevant and probative evidence for a local government to consider in evaluating whether a similar land use activity conducted by the same entity, in a similar manner, and in a similar type of location will pose a detriment to its community — should not be applicable to the case at bar. Although the Commonwealth Court and EQT attach great significance to the fact that the Union Township residents did not present evidence regarding how the Bickerton site would specifically impact the lives of Borough residents, as the Borough and the dissent below have emphasized, the evidence of record in this matter, which is not disputed by EQT, demonstrated that there is a significant degree of similarity between the nature of the proposed land use at the Bickerton site and the present use of the Trax Farm site.

The unrebutted evidence provided through the testimony of the Union Township objectors, discussed above, considered in its entirety, established that EQT's Trax Farm site was of a similar nature to its proposed Bickerton site.[12] Because EQT would be

_____

[12] As to the dissent's contention that EQT had no burden to rebut Objectors' evidence given the dissent's conclusion that such evidence lacked proper foundation, Dissenting Opinion (Mundy, J.) at 5, we make the following observation. As discussed *supra*, the

conducting drilling activities at the Bickerton site in the same manner as the Trax Farm site, once the Bickerton site is completed, and fracking begins there, both sites will feature multiple unconventional well pads on which EQT will be drilling for natural gas and conducting other operational activities associated with that process on a round-the-clock basis, and both sites are located in similar close proximity to residences.

This similarity rendered the testimony of the Union Township residents, as to their firsthand actual experiences with the effects of the construction and operational activities at the Trax Farm site, relevant and probative as to the question of whether the grant of conditional use approval to EQT for construction and operation of the Bickerton site would adversely impact the health, safety, and general welfare of the residents of Jefferson Borough. As Professor Wigmore has explained:

> The general logical requirement is . . . that when a thing's capacity or tendency to produce an effect of a given sort is to be evidenced by instances of the same effect found attending the same thing elsewhere, these other instances have probative value--*i.e.*, are relevant--to show such a tendency or capacity only if the conditions or circumstances in the other instances are similar to those in the case at hand.
>
> * * *
>
> But this similarity need not be precise in every detail. It need include only those circumstances or conditions which might conceivably have some influence in affecting the result in question. . . . The similarity that is required is, in short, a similarity in essential circumstances, or, as it is usually

Borough's zoning ordinance required that, *in addition to* demonstrating compliance with the conditions for grant of a conditional use set forth in the Borough's ordinance, an applicant for a conditional use "shall demonstrate" that "[t]he use shall not endanger the public health, safety or welfare nor deteriorate the environment, as a result of being located on the property where it is proposed." Borough of Jefferson Hills Zoning Ordinance § 1003(a). Thus, under this ordinance, in order to be granted a conditional use, EQT was required to establish these additional criteria. It was on the basis of Objectors' unrebutted testimony that the Borough Council found that EQT never carried this burden of proof. Jefferson Township Council Decision on EQT Conditional Use Application, 12/23/15, at 26. As a result, whatever the basis for EQT's decision not to rebut Objectors' evidence, it ran the risk that the Borough, and ultimately this Court, would conclude that such evidence was properly admitted.

> expressed, a substantial similarity, i.e., a similarity in such
> circumstances or conditions as might supposably affect the
> result in question

David P. Leonard, *The New Wigmore. A Treatise on Evidence: Evidence of Other Misconduct and Similar Events.* § 14.3 (2018) (footnotes, internal quotation marks and original emphasis omitted).

Thus, the testimony of the Union Township objectors as to the foul stenches, intense vibrations, loud and penetrating sounds, and increased levels of traffic and air and light pollution they continuously endured, in and around their homes, was both relevant and probative in establishing the potential adverse impacts which Jefferson Borough residents living near the Bickerton site reasonably could expect. Likewise, the numerous health effects, and the significantly diminished quality of day-to-day life experienced by the Union Township objectors, which they perceived to be caused by their exposure to these phenomena, was relevant and probative of how the health and overall welfare of Jefferson Borough residents reasonably could be diminished by the operation of the Bickerton site, if it were approved.

Similarly, testimony about EQT's proffer of waiver agreements to residents living near the Trax Farm site in response to the deleterious effects they perceived EQT's drilling activities to be causing to both the value of their property, and their ability to use and enjoy it, was suggestive of a practice by EQT to not terminate activities which were adversely affecting residents living near its well sites, but, instead, to pay them so that EQT could continue those activities without alteration.[13] This was both relevant and

---

[13] In response to the dissent's observation that, in the easement agreements, EQT denied responsibility for causing the harms of which the residents complained, Dissenting Opinion (Mundy, J.) at 4-5, we presume that Council, having received this evidence, was aware of this denial. However, as finder of fact, it was free to assign whatever weight that it deemed appropriate to this evidence. Moreover, it is not any putative assignment of liability in the agreements themselves which gave them relevance; rather, the agreements

probative of how EQT reasonably could be expected to handle complaints from Jefferson Borough residents living near the Bickerton site, and to respond to the concerns of Borough residents who complained of similar negative impacts.

In sum, then, we conclude that the testimonial evidence of the Union Township objectors was both relevant and probative as to the question of whether the grant of conditional use authorization to EQT for construction and operation of the Bickerton site would adversely impact the health, safety, and general welfare of the residents of Jefferson Borough; therefore, it was properly received and considered by Council in rendering its decision on EQT's application. The Commonwealth Court panel improperly characterized this firsthand experiential evidence as "speculative"; therefore, we are constrained to vacate the order of the Commonwealth Court and remand to that tribunal, with instructions to remand this matter to the trial court to reconsider its decision in light of this opinion.

Order vacated and case remanded with instructions. Jurisdiction relinquished.

Chief Justice Saylor and Justices Baer, Donohue, Dougherty and Wecht join the opinion.

Justice Mundy files a dissenting opinion.

---

were probative of the *practice* of EQT in responding to residents' complaints about how its drilling activities were affecting their health and property.