Water Gap Capital Partners, LLC,    :
   :
                  Appellant    :
   :
             v.    : No. 1304 C.D. 2021
   : Argued: September 12, 2022
Smithfield Township Board of    :
Supervisors, John Shoemaker, William    :
Buzzard, Terrence Fagan, Maryann    :
Fagan, Neferetiti Campbell, Tony    :
Ganci, Valerie Ganci, Joseph Iudicello,    :
Marshall E. Anders, Patricia Anders,    :
Bradley Rinschler, Terry Lynn Teel    :
and Richard Oshrin    :

BEFORE:    HONORABLE MICHAEL H. WOJCIK, Judge
                 HONORABLE LORI A. DUMAS, Judge
                 HONORABLE MARY HANNAH LEAVITT, Senior Judge

<u>OPINION NOT REPORTED</u>

MEMORANDUM OPINION
BY JUDGE WOJCIK                        FILED: May 19, 2023

       Water Gap Capital Partners, LLC (Water Gap) appeals from an order of the Court of Common Pleas of Monroe County (trial court), dated October 15, 2021, that affirmed the April 13, 2021 decision of the Smithfield Township (Township) Board of Supervisors (Board) denying Water Gap's conditional use application (Application) for a drug and alcohol treatment facility. Water Gap contends that the Board erred or abused its discretion in determining that Objectors[1]

---

[1] Objectors are John Shoemaker, William Buzzard, Terrance Fagan, Maryann Fagan, Neferetiti Campbell, Tony Ganci, Valerie Ganci, Joseph Iudicello, Marshall E. Anders, Patricia

**(Footnote continued on next page…)**

met their heavy burden of proving that Water Gap's proposed use would be more detrimental than would be typical for a state regulated drug and alcohol abuse treatment facility. Upon review, we affirm.

In a related case, Water Gap was granted a curative amendment allowing the operation of a residential drug and alcohol treatment facility (proposed use) in the Township's R-1 Low Density Residential Zone (R-1 Zone) pursuant to Section 609.1 of the Pennsylvania Municipalities Planning Code (MPC),[2] after successfully challenging the Smithfield Township Zoning Ordinance (Ordinance) as exclusionary because it did not permit such use anywhere within the Township. *See Shoemaker v. Smithfield Township Board of Supervisors and Water Gap Capital Partners, LLC* (Pa. Cmwlth., No. 613 C.D. 2021, filed February 27, 2023) (*Shoemaker*) (affirming the determination that the Ordinance was exclusionary and that the curative amendment was properly granted). Water Gap then filed the Application seeking conditional use approval of the proposed use.

The location for the proposed use is a 40-acre tract of land (Property) that was part of a 156-acre golf resort known as the Water Gap Country Club.[3] The Property is improved with an inn, pro club, golf course, swimming pool, and parking areas. Water Gap renovated the inn with new electrical wiring, HVAC, ceilings and flooring, and improved the existing water and septic systems. The inn has 24 double-occupancy rooms with a maximum capacity of 48 people. Water Gap has used the

---

Anders, Bradley Rinschler, Terry Lynn Teel, and Richard Oshrin, and have intervened in this matter.

[2] Act of July 31, 1968, P.L. 805, *as amended, reenacted by* the Act of December 21, 1988, P.L. 1329, 53 P.S. §10609.1.

[3] The 156-acre parcel is located in both Smithfield Township and the Borough of Delaware Water Gap, but the subject Property is located entirely within Smithfield Township.

Property to house clientele suffering from drug and alcohol addiction (patients) receiving treatment at Water Gap's offsite outpatient facility located in East Stroudsburg (outpatient facility). Reproduced Record (R.R.) at 207a, 313a.

The Board held several hearings on Water Gap's Application. At the outset of the hearings, the parties stipulated to incorporate the record of all prior proceedings to avoid duplication of evidence and testimony.[4] *See* R.R. at 199a. Water Gap presented additional testimony and evidence, including the testimony of Joseph Schlim (Schlim), a principal of Water Gap. In opposition, Objectors presented the testimony of former Water Gap employees regarding operations at the Property, as well as community residents who testified regarding their personal encounters with the patients staying at the Property.

Following the close of evidence, the Board denied the Application by decision dated April 13, 2021. The Board found that Water Gap did not meet the criteria for conditional use and that Objectors met their burden of proving detrimental effect. Water Gap appealed to the trial court.[5] By decision dated October 15, 2021, the trial court reversed the Board insofar as it found that Water Gap had failed to meet the criteria for conditional use. However, the trial court otherwise affirmed the denial upon determining that the Objectors sustained their

---

[4] This included the record from the proceedings conducted pursuant to Section 302.2 of the Ordinance and Section 609.1(c) of the MPC, 53 P.S. §10609.1(c). R.R. at 199a.

[5] Water Gap filed a motion to supplement/correct the record to include information omitted by the Board, namely, the site plan and review by the Township's Planning Commission and engineer. The trial court granted the motion and supplemented the record to include these items. Because this supplement was a correction of the record, as opposed to the receipt of additional evidence, the trial court did not review the matter *de novo*.

burden of showing that the proposed use would be detrimental to the community. This appeal now follows.[6]

Water Gap contends that the Board erred and abused its discretion in determining that Objectors met their heavy burden of proving that the proposed use of the Property would be more detrimental than would be typical for a state regulated drug, alcohol and substance abuse treatment facility. The Board approved Water Gap's curative amendment to the Ordinance to allow the proposed use as a conditional use in the R-1 Zone. The approval entitled Water Gap to a presumption that the proposed use was consistent with and not detrimental to the general welfare of the community in the R-1 Zone. In the face of unwavering opposition from Objectors who opposed any change of the use of the Property, as well as the Board's independent investigations conducted outside the conditional use proceedings, the Board denied the Application. According to Water Gap, the Board's decision was based on the improper finding that Objectors had met their heavy burden of showing a detrimental effect on the community, despite a lack of evidence to show that the proposed use would be more detrimental than any other drug, alcohol, and substance abuse treatment center. Evidence regarding a temporary, nonregulated use of the Property was not probative as to whether the proposed use itself would be of a greater impact than a comparable drug and alcohol treatment facility.

---

[6] Where, as here, the trial court does not take additional evidence, our review is limited to determining whether the Board abused its discretion, or committed an error of law in denying a conditional use application. *EQT Production Co. v. Borough of Jefferson Hills*, 208 A.3d 1010, 1024 (Pa. 2019). "An abuse of discretion will only be found in circumstances wherein the findings of the Board are not supported by substantial evidence." *Visionquest National, Ltd. v. Board of Supervisors of Honey Brook Township, Chester County*, 569 A.2d 915, 918 (Pa. 1990). "Substantial evidence is 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *EQT*, 208 A.3d at 1024 (quoting *Gorsline v. Board of Supervisors of Fairfield Township*, 186 A.3d 375, 385 (Pa. 2018)).

4

A conditional use in a zoning ordinance "indicates legislative acceptance that the use is consistent with the zoning plan and a use application should only be denied where the adverse impact on the public interest exceeds that which might be expected in normal circumstances." *In re McGlynn*, 974 A.2d 525, 537 (Pa. Cmwlth. 2009). An application for conditional use involves a shifting burden of persuasion:

> First, the applicant must persuade the local governing body its proposed use is a type permitted by conditional use and the proposed use complies with the requirements in the ordinance for such a conditional use. Once it does so, a presumption arises the proposed use is consistent with the general welfare. The burden then shifts to objectors to rebut the presumption by proving, to a high degree of probability, the proposed use will adversely affect the public welfare in a way not normally expected from the type of use.

*Aldridge v. Jackson Township*, 983 A.2d 247, 253 (Pa. Cmwlth. 2009) (citations and footnote omitted); *accord In re McGlynn*, 974 A.2d at 537; *In re Thompson*, 896 A.2d 659, 670 (Pa. Cmwlth. 2006); *Sunnyside Up Corp. v. City of Lancaster Zoning Hearing Board*, 739 A.2d 644, 650 (Pa. Cmwlth. 1999). The objectors cannot meet their burden with a "speculation of possible harms." *Marquise Investment, Inc. v. City of Pittsburgh*, 11 A.3d 607, 615 (Pa. Cmwlth. 2010); *Sunnyside Up*, 739 A.2d at 650. In other words, the objectors' "evidence cannot consist of mere 'bald assertions, personal opinions and perceptions' of the use and its effect on the neighborhood." *Visionquest National, Ltd. v. Board of Supervisors of Honeybrook Township*, 569 A.2d 915, 917 (Pa. 1990) (quoting *Commonwealth of Pennsylvania, Bureau of Corrections v. City of Pittsburgh*, 532 A.2d 12 (Pa. 1987)). Rather, the objectors must present substantial evidence regarding actual harm. *Id.*

5

In meeting this burden, an applicant's past conduct is both relevant and probative in determining whether the applicant meets the conditions of licensure for conducting future business activities of the same nature as those in which it had previously engaged. *EQT Production Co. v. Borough of Jefferson Hills*, 208 A.3d 1010, 1026 (Pa. 2019); *see Street Road Bar and Grille v. Pennsylvania Liquor Control Board*, 876 A.2d 346, 357-58 (Pa. 2005) (holding that prior instances of conduct of liquor license applicant, including liquor code violations, was both relevant and "extremely probative" in determining whether applicant met the statutory criteria for being reputable, given that this history was an accurate gauge of whether the applicant had the requisite degree of fitness required to operate a liquor selling establishment). "[T]estimony as to prior experiences with the specific proposed use, while the use was conducted unapproved or unlawfully, *should be given greater weight in determining the detriment to the community as such testimony is clearly not speculative*." *Visionquest*, 569 A.2d at 918 (emphasis added). "[E]vidence relating to past conduct and practices of a facility's owners, and specific impacts on the community from the functioning of the facility, [is] relevant and probative in determining whether, if conditional use authorization were granted, the facility's operation would pose a threat to the welfare of the community." *EQT*, 208 A.3d at 1026.

In determining whether Objectors here met their burden, we are guided by *Visionquest*. In *Visionquest*, an applicant sought conditional use approval from a municipality's governing body to continue operation of a rehabilitative facility, which was structured as a wilderness camp that housed youths with behavioral difficulties. The applicant was already operating the facility without conditional use approval. At the conditional use hearing before the municipality's governing body,

6

neighboring residents objected to the conditional use and presented testimony regarding incidents occurring at the facility that disrupted their daily lives, namely, obscenities and loud noises emanating from the facility every morning. The residents detailed their apprehension about the potential for escapes occurring from the facility, as well as their fears that escapees would cause damage to their property. The residents presented evidence that such escapes had already occurred while the facility was operating in an unlicensed manner, and that, during the time searches were underway for the escapees, the facility's operators advised residents to take necessary precautions. Additionally, the residents presented evidence regarding incidents of property damage at a similar facility owned and operated by the same applicant in another county, and that applicant had expressly disclaimed responsibility for any property damage caused by escaped youths. The governing body denied the conditional use application on the ground that it did not meet the objective criteria of the zoning ordinance governing the grant of a conditional use permit, and that, even if it did, denial was justified because the proposed use "would have a detrimental effect on the welfare of the community." *Visionquest*, 569 A.2d at 916-17. The applicant appealed.

The trial court found that the applicant had met the objective criteria established by the zoning ordinance for the grant of the conditional use exception. *Visionquest*, 569 A.2d at 917. However, the trial court upheld the denial based on the evidence relating to the facility's operations, as well as incidents of property damage arising out of the applicant's operation of a similar facility in another county. The trial court found that this evidence supported a finding that denial was warranted because of the detriment to the community. *Id.* On subsequent appeal, this Court reversed on the basis that the evidence constituted "unsupported anxieties" that only

7

showed "the mere possibility of an adverse impact," which was insufficient to prove detriment. *Id.*

On further appeal, the Supreme Court reversed our order. *Visionquest*, 569 A.2d at 919. The Supreme Court examined the governing body's "findings to determine whether the applicant met the criteria of a school under the conditional use ordinance and whether the residents met their burden of proving that the proposed use would have a detrimental effect on the community." *Id.* at 918.

Notably, the Supreme Court began its discussion with whether substantial evidence supported the residents' claim that this proposed use would pose a greater detriment to the community than any other school facility. *Visionquest*, 569 A.2d at 918. The Supreme Court examined the evidence received by the governing body, as detailed above, particularly evidence provided by the residents of the community regarding how the facility impacted their day-to-day lives while it was in operation. *Id.* The Supreme Court concluded that this evidence was "sufficient evidence" to enable the residents to demonstrate the requisite detriment. *Id.* The Supreme Court expressly rejected this Court's conclusion that such testimony constituted only "bald assertions," or "unsupported anxieties." *Id.* Rather, the residents offered "testimony as to their experiences with this specific facility during its illegal and unlicensed activity." *Id.*; *accord EQT*, 208 A.3d at 1026.

The Supreme Court then went on to determine that the youth facility did not satisfy the objective criteria to be a "school" under the township's zoning ordinance. *Visionquest*, 569 A.2d at 918-19. The facility was penological in nature, and the zoning ordinance excluded correctional or penal institutions from the zoning

8

district where the camp was located. *Id.* Thus, the use proposed was a conditional use that was not contemplated by the ordinance. *Id.*

Ordinarily, if the objective criteria are not met, the burden of persuasion never shifts to the objectors to prove detriment. *See Aldridge*. However, the Supreme Court in *Visionquest* engaged in the community detriment analysis *first*. *Visionquest*, 569 A.2d at 916-918. In so doing, the Supreme Court established clear guidance as to what is necessary for Objectors to meet their burden. *Id.*

Here, although the Board found that Water Gap did not meet the objective requirements of the Ordinance, the trial court remedied this error. The trial court applied the correct legal standard for burden of proof with respect to conditional use applications as set forth above. *See Aldridge*; *McGlynn*; *Thompson*; *Sunnyside Up*. The trial court determined that Water Gap met its burden of proving that its proposed use is the type of use permitted by conditional use, and that it complied with the specific requirements of the Ordinance for such use. Consequently, a presumption arose that Water Gap's proposed use would be consistent with the health, safety, and general welfare of the community. *See Aldridge*. This is not disputed on appeal. Accordingly, the burden shifted to Objectors to rebut the presumption by demonstrating to a high degree of probability that the proposed use will adversely affect the public welfare in a way not normally expected from a drug and alcohol treatment facility. *Id.*

To that end, as in *Visionquest*, Objectors offered evidence regarding Water Gap's unregulated and unapproved use. Diane Dellocono (Dellocono), a licensed practical nurse and Water Gap's former Director of Nursing/Director of Client Care who worked at the Property and the outpatient facility in 2020, testified regarding the Property's operations during her tenure. R.R. at 200a, 203a-5a, 208a.

9

Dellocono testified that prescription medications, which were prescribed by Water Gap's psychiatrist and chief medical officer, Robert Morrow, M.D. (Dr. Morrow), and called in by her, were delivered directly to the Property to Water Gap staff, not to the patients. *Id.* at 209a-13a, 353a. Water Gap stored the medications in locked cabinets at the Property. *Id.* at 211a. Water Gap staff dispensed medications to the patients at regular intervals in a hospital-like manner. *Id.* at 209a-13a, 352a-54a. Nurses administered some medications by injection. *Id.* at 213a, 353a. The patients' vital signs were routinely checked and recorded with the medication administration. *Id.* at 354a. Patients also received counseling and one-on-one therapy at the Property. *Id.* at 223a.

Heather O'Donnell (O'Donnell), a licensed professional counselor who worked for Water Gap primarily at its outpatient facility in 2020, testified that she frequently provided counseling sessions to patients at the Property. R.R. at 464a. She also testified that medications were stored in a locker and were regularly distributed to patients at the Property. *Id.* at 465a. The medications included a variety of psychotropic medications, including antidepressants, antianxieties, and antipsychotics in addition to substance addiction therapies. *Id.* at 472a.

Both witnesses testified that Water Gap housed and treated some patients suffering solely from mental health issues and not addiction issues. R.R. at 215a-16a, 343a, 349a, 467a-68a. The mental health diagnoses included paranoid schizophrenia and bipolar disorder. *Id.* at 216a, 349a.

Dellocono's and O'Donnell's testimony regarding treatment administered at the Property was corroborated by admissions made by Schlim during testimony offered in rebuttal. Initially, Schlim testified that patients staying at the Property received no treatment at the Property, only at the outpatient facility. R.R.

10

at 313a. Although Schlim acknowledged that the pharmacies regularly delivered medications to the Property, he maintained that they were delivered and belonged to the patients themselves. *Id.* However, on cross-examination, Schlim admitted that the medications were delivered to Water Gap staff, not the patients themselves. *Id.* at 326a-28a. He admitted that Water Gap stored those medications for its patients onsite in locked cabinets. *Id.* at 314a-15a, 328a. Although Schlim initially testified that Water Gap staff did not dispense any medications, *id.* at 314a, he later admitted that staff not only dispensed medications but monitored whether the medications were taken and how much. *Id.* at 329a, 336a-37a. Schlim admitted that nurses visited the Property. *Id.* at 328a. Schlim testified that the Property housed patients seeking treatment at the offsite facility, which included patients with acute mental health issues who did not have a substance abuse diagnosis. *See id.* at 343a, 345a.

In addition, Dellocono testified that, before an inspection of the Property, Water Gap removed all indications that treatment was taking place at the Property. R.R. at 215a. All signage regarding medications were removed. *Id.* Even her title was changed from "Director of Nursing" to "Director of Client Care." *Id.* O'Donnell testified that, in late August or early September 2020, Schlim advised her to stop providing counseling services at the Property. *Id.* at 464a. Such testimony bares the surreptitious nature of Water Gap's operations.

Despite operating as an unlicensed residential treatment facility for patients with mental illness and/or substance abuse issues, Water Gap did not have appropriate security measures and safeguards in place for the safety of its patients and the surrounding community. R.R. at 473a and 479a. Water Gap conceded that such measures would be in place if it were a licensed treatment facility. *See id.* at 322a (Schlim testified that "with residential treatment there are more structured rules

11

in the treatment setting including 24-7 security and surveillance staffing, therapists who would be on site every day, and support staff who are trained in de[-]escalation techniques."); *see also id.* at 347a (Schlim testified there are a different set of requirements for a residential treatment facility).

Both Dellocono and O'Donnell expressed concern that some patients staying at the Property were a danger to themselves and to others because of the lack of security and safeguards. R.R. at 218a-19a, 473a. Both testified that some patients staying at the Property were on suicide watch. *Id.* at 219a, 469a. Dellocono testified that, on two occasions, patients "cut themselves." *Id.* at 220a. Even Schlim conceded that some of the patients residing at the Property had inflicted self-harm. *Id.* at 330a-31a.

O'Donnell noted incidents of patients leaving the Property unsupervised. R.R. at 470a, 473a. Dellocono testified that, on one occasion, a patient left his room overnight, went missing for 12 hours, purchased drugs, and brought them back to the Property. *Id.* at 220a.

Neighboring residents offered firsthand accounts of encounters involving Water Gap's patients in the community. Resident and former Township Mayor, Walter T. Conway, Jr., described an incident where a man, who had stabbed himself, entered his property. Attendants pursued the man and tried to persuade him to return with them. Shortly thereafter, state and local police responded to the scene along with an ambulance, which took the man away. R.R. at 225a-33a.

Additional residents testified regarding their encounters with Water Gap patients on the outskirts of the Property. One resident testified he overheard a patient screaming loudly for 15 to 20 minutes that he wanted to kill someone. R.R. at 239a-41a, 244a, 247a; *see id.* at 306a-7a. Another resident overheard a patient's

cellphone conversation that he "was going to die if he didn't straighten up." *Id.* at 489a. The residents described the patients as alone, unsupervised, and highly agitated, and the residents feared for their safety. *Id.* at 238a-46a, 489a.

Generally, the neighboring residents' negative reported experiences with patients residing at a drug and alcohol treatment facility in their community showed an impact that can be expected for such a facility. *See In re Thompson*, 896 A.2d at 679 (not only are the objectors required to "show a high probability that the proposed use will cause adverse impact *but also that the proposed use would create an adverse impact not normally generated by the type of use proposed*") (emphasis added). However, the evidence regarding Water Gap's unregulated and unapproved use while the conditional use application was pending, together with the neighboring residents' experiences, provided the requisite evidence that Water Gap's proposed use would create an adverse impact not normally generated by a drug and alcohol treatment facility.

The foregoing evidence demonstrated that Water Gap was not just housing patients who were being treated at its outpatient facility but was treating and medicating them at the Property. Some patients had acute mental health issues, without addiction issues. Such patients would not normally be expected at a residential drug and alcohol treatment facility.[7] Water Gap furnished treatment without a license from the Commonwealth of Pennsylvania to operate a drug and

---

[7] In *Shoemaker*, the trial court relied upon Dr. Morrow's testimony distinguishing a drug and alcohol rehabilitation facility from "hospital" or "specialty hospital" as those terms were defined in the Ordinance in granting Water Gap's curative amendment to allow the proposed use on the Property. Dr. Morrow testified that patients with serious mental illness requiring medical treatment in a hospital would be referred to a hospital and would not be accepted at the proposed facility. *Shoemaker*, slip op. at 9. He explained that patients coming to a residential inpatient drug and alcohol treatment facility do not require primary medical care as offered by a hospital, but a step-down level of care involving medical oversight and counseling. *Id.* at 8-9.

13

alcohol rehabilitation center or mental health center on the Property and without conditional use approval from the Township. R.R. at 324a-25a. Despite the Property's illicit operation as a residential treatment facility, Water Gap did not maintain appropriate security or surveillance measures to keep patients on the Property that would be in place if it were a licensed treatment facility.

Upon review, Objectors met their burden of proving that Water Gap's proposed use would adversely affect their neighborhood more than would otherwise be expected under normal circumstances from this type of use. Objectors' evidence was not based on "bald assertions" or speculations regarding potential harm or what could happen, but rather was based on firsthand "experiences with this specific facility during its illegal and unlicensed activity" and actual encounters with Water Gap's patients in their community that caused them to be fearful. *Visionquest*, 569 A.2d at 918. As in *Visionquest*, such evidence constitutes relevant and probative evidence regarding the detrimental effect that the proposed use would have and has had on their community. *See id.* Furthermore, Water Gap's mismanagement and deceitfulness regarding its illegal operation of an unlicensed and unapproved treatment facility contributed to the problems and undermined the Board's faith that Water Gap would safely operate the proposed use in accordance with legal requirements and any conditions that the Board might impose. We, therefore, conclude that the Board did not err or commit an abuse of discretion in denying Water Gap's Application.

Accordingly, we affirm the trial court's order.

_____
MICHAEL H. WOJCIK, Judge

14

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Water Gap Capital Partners, LLC,    :
    :
            Appellant    :
    :
        v.    :  No. 1304 C.D. 2021
    :
Smithfield Township Board of    :
Supervisors, John Shoemaker, William  :
Buzzard, Terrence Fagan, Maryann    :
Fagan, Neferetiti Campbell, Tony    :
Ganci, Valerie Ganci, Joseph Iudicello,  :
Marshall E. Anders, Patricia Anders,    :
Bradley Rinschler, Terry Lynn Teel    :
and Richard Oshrin    :

# **O R D E R**

AND NOW, this 19th day of May, 2023, the order of the Court of Common Pleas of Monroe County, dated October 15, 2021, is AFFIRMED.

_____
MICHAEL H. WOJCIK, Judge