PRECEDENTIAL

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT
_____

No. 19-3621
_____

431 EAST PALISADE AVENUE REAL ESTATE, LLC;
7 NORTH WOODLAND STREET, LLC;
JOHN AND JANE DOES 1-10

v.

CITY OF ENGLEWOOD;
CITY COUNCIL OF ENGLEWOOD,

Appellants
_____

On Appeal from the United States
District Court for the District of New Jersey
(D.C. Civ. Action No. 2-19-cv-14515)
District Judge: Hon. Brian R. Martinotti
_____

Argued March 25, 2020
_____

Before: JORDAN, RESTREPO, and FUENTES,
*Circuit Judges*.

(Opinion filed: October 8, 2020)

Daniel Antonelli **(Argued)**
Antonelli Kantor
1000 Stuyvesant Avenue, Suite 1
Union, New Jersey 07083

*Counsel for Appellants*

Warren A. Usatine
Michael R. Yellin
Cole Schotz P.C.
25 Main Street
Court Plaza North, P.O. Box 800
Hackensack, New Jersey 07601

Roy T. Englert, Jr. **(Argued)**
Lee T. Friedman
Robbins, Russell, Englert, Orseck,
Untereiner & Sauber LLP
2000 K St. N.W., 4th Floor
Washington, D.C. 20006

*Counsel for Appellees*

_____

OPINION

_____

FUENTES, *Circuit Judge*.

Developers 431 East Palisade Avenue Real Estate LLC and 7 North Woodland Street LLC (collectively, "Palisade") seek to build a 150-bed assisted living facility in a single-family residential district in the City of Englewood, New Jersey (the "City"). Palisade believes that the City's zoning ordinance discriminates on its face against individuals with disabilities by not permitting assisted living facilities as of right in the single-family district and by explicitly allowing them in only one district in the City. The District Court agreed and granted a preliminary injunction.[1]

We must decide whether the City's zoning ordinance, by failing to include "assisted living facilities" among its permitted uses in the single-family district, but explicitly allowing them in a different district, facially discriminates against the disabled in violation of the Fair Housing Amendments Act ("FHAA").[2] We conclude that the City's zoning ordinance is not facially discriminatory.

Accordingly, the District Court erred in granting a

_____

[1] *431 E Palisade Ave. Real Estate, LLC, v. City of Englewood*, No. 219-cv-14515-BRM-JAD, 2019 WL 5078865, at *1 (D.N.J. Oct. 10, 2019).

[2] 42 U.S.C. § 3601, *et seq.*

preliminary injunction.  We will therefore vacate and remand for further proceedings.

## I.

## A.

On a 4.96 acre parcel of land located partially in the City and partially in the Borough of Englewood Cliffs,[3] Palisade, a developer, seeks to build a 150-bed for-profit assisted living facility, which would provide supportive services to memory care patients.  The City opposes its construction.  The residential district in question is a "one-family residence district,"[4] zoned R-AAA, and is one of the City's twenty-four districts that allows residential living.

As the District Court observed of the City's zoning ordinance, "[t]here is no express language . . . prohibiting or discriminating against either the elderly or the handicapped in any of [the City's] districts."[5]  Instead, the R-AAA district explicitly allows for only seven uses, the first of which is "one-family dwelling[s]."[6]  The City's zoning ordinance defines a

---

[3] The properties comprising the parcel are located at 431 East Palisade Avenue, 405 East Palisade Avenue, and 7 North Woodland Street.

[4] App. 360-61.

[5] *Palisade*, 2019 WL 5078865, at *7.

[6] The following are the sole uses explicitly permitted in the R-AAA zone:

4

"One-Family Dwelling" to be a "building designed for, or occupied exclusively by, one family and not designed or used as . . . a group home or congregate living facility in which a

> (1) A one-family dwelling, not to exceed one such dwelling on anyone lot.
> (2) Accessory uses, accessory buildings and accessory structures . . .
> (3) Municipal purposes.
> (4) Parks and playgrounds.
> (5) Nature preserve and nature study area.
> (6) Public schools and private nonprofit day schools accredited by the New Jersey State Department of Education, for grades not above high school, and day-care centers licensed by the State of New Jersey, as conditional uses . . .
> (7) Places of worship, including accessory religious instructional facilities, . . . .

App. 360–61.

person's continued occupancy is dependent upon the payment of a fixed rent or room charge."[7]

"Assisted living facilities" are not specifically defined under the City's zoning ordinance, but New Jersey's Administrative Code defines "assisted living" as "a coordinated array of supportive personal and health services, available 24 hours per day, to residents who have been assessed to need these services including persons who require nursing home level of care."[8] That Code further defines an "[a]ssisted living residence" as "a facility which is licensed . . . to provide apartment-style housing and congregate dining and to assure that assisted living services are available when needed, for four or more adult persons unrelated to the proprietor."[9]

According to the City's zoning ordinance, the single-family zone's purpose "is to preserve and protect the integrity of such districts for one-family residential purposes, to establish one-family residence districts that provide for a range of lot sizes, and to permit in such districts only such other uses as will be compatible with one-family residential use."[10]

The City zoning ordinance permits assisted living facilities to be constructed as of right only in a single district, the "Research, Industrial, Medical (RIM) District." Other

---

[7] App. 352. Accordingly, a number of individuals with disabilities could live together in a congregate home, provided they do not do so pursuant to a formal rent arrangement.
[8] N.J. Admin. Code § 8:36-1.3.
[9] *Id.*
[10] App. 361.

6

permitted uses there include medical offices, rehabilitation centers, skilled nursing facilities, hotels, and apartment and condominium communities for senior citizens. Among the RIM zone's stated purposes is "to foster the development of medical and health care facilities that complement the existing medical and health care services located throughout the City."[11] "Senior housing is permitted to complement future medical and health care services and to contribute to a sense of a health care village that offers care and living opportunities for older persons."[12] Though the RIM zone "permit[s] land uses that reflect contemporary light industrial economies," the district is not solely industrial and "already encompasses several multifamily residential complexes."[13]

The City admits that the zoning ordinance requires a variance to build an assisted living facility of the type proposed by Palisade in any district besides the RIM zone, including the R-AAA zone, but the City also notes that New Jersey law privileges this development. For example, in seeking such a use variance, developers of group homes for individuals with disabilities (including assisted living facilities) in New Jersey face a reduced qualification standard, because such facilities are considered an "inherently beneficial use."[14]

---

[11] *Id*. at 435.

[12] *Id*.

[13] *Id*. at 434-35.

[14] *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 467 (3d Cir. 2002) (citing *Smart SMR of N.Y., Inc. v. Borough of Fair Lawn Bd. of Adjustment*, 704 A.2d 1271, 1281 (N.J. 1998)).

**B.**

Palisade has not submitted a formal application for a variance, having taken the position that such a step would be futile and that the variance application process is itself discriminatory. Instead, it engaged in various conversations with the City regarding its proposed development. In a letter dated January 14, 2019, Palisade requested that the City Council rezone the property. The City took no action toward rezoning.

On June 28, 2019, Palisade filed a complaint alleging violations of the FHAA, among other causes of action. By application for an order to show cause, Palisade sought a preliminary injunction barring the City from enforcing any provisions of the zoning ordinance against it.

Palisade advanced three general arguments: (1) that the ordinance discriminates against the disabled on its face (a disparate treatment claim); (2) that the City's enforcement of the ordinance has a disparate impact on the disabled; and (3) that the City failed to offer a reasonable accommodation.

The District Court granted the preliminary injunction, accepting Palisade's theory that the zoning ordinance was facially discriminatory.[15] It acknowledged that "the City's

---

[15] Concluding that the same standards apply to Palisade's FHAA claim and its other federal statutory disability discrimination claims, the District Court did not separately reach the merits of those other claims. And because the District Court found in Palisade's favor on the FHAA

zoning ordinances do not expressly state that assisted-living centers are prohibited from districts primarily designed as residential" and that "[t]here also is no language explicitly stating that assisted-living centers are limited to the RIM district, or providing that assisted-living centers are barred from being a permitted, or even conditional, use in any other district."[16]

Nevertheless, the District Court reasoned that, because the City's zoning ordinance explicitly names assisted living facilities in the RIM zone and expressly permits them only there, it effectively excludes them from the R-AAA zone. The District Court concluded that "the failure of the Code to employ such negative words as assisted-living centers are 'prohibited,' or 'banned,' or 'forbidden' from any other district other than the RIM district, as argued by Defendants, does not disguise the fact that assisted-living centers are not permitted uses in any district defined residential as its primary character."[17] The District Court went on to determine that the exclusion of assisted living facilities from the R-AAA zone was intentional based on the City's stated desire to create a "health care village" in the RIM zone, and that such deliberate exclusion violated the FHAA by precluding the disabled from living in the residence of their choice.[18]

___

claim, it did not address Palisade's additional federal and state law causes of action.

[16] *Palisade*, 2019 WL 5078865, at *9.

[17] *Id.*

[18] *Id.* at *10.

Concluding that Palisade had shown a likelihood of success on the merits of its facial disparate treatment claim, the District Court found the remaining factors favored granting injunctive relief. Though the District Court granted the preliminary injunction, with the practical effect that Palisade's "plans for developing the Property as a 150-bed assisted living center would be considered a permitted use in the residential zone," it suggested that Palisade would continue to be "subject to the remaining procedures of the City of Englewood's land-use process."[19]

**II**.[20]

The District Court concluded that, because the zoning ordinance treats assisted living facilities differently from single-family homes, by explicitly permitting them in the RIM zone and implicitly excluding them from all others, the zoning ordinance's different treatment and express use of the term "assisted living facility," constitutes facial discrimination in violation of the FHAA.

"We review the grant or denial of a preliminary injunction for 'an abuse of discretion, an error of

---

[19] *Id*. at \*5 & n.9. The District Court did not reach the disparate impact and reasonable accommodation issues.

[20] The District Court had jurisdiction pursuant to 28 U.S.C. § 1331. We have jurisdiction pursuant to 28 U.S.C. § 1292(a)(1), because this appeal stems from the grant of a preliminary injunction.

law, or a clear mistake in the consideration of proof.'"[21] Because we conclude that the zoning ordinance does not

[21] *Greater Philadelphia Chamber of Commerce v. City of Phila.*, 949 F.3d 116, 133–34 (3d Cir. 2020) (quoting *Doe by & through Doe v. Boyertown Area Sch. Dist.*, 897 F.3d 518, 526 (3d Cir. 2018)). "We review de novo the lower court's conclusions of law but review its findings of fact for clear error." *Id.* at 134. "A preliminary injunction 'is an extraordinary remedy, which should be granted only in limited circumstances.'" *Id.* at 133 (quoting *Instant Air Freight Co. v. C.F. Air Freight, Inc.*, 882 F.2d 797, 800 (3d Cir. 1989)). To obtain a preliminary injunction, the moving party must show:

> (1) a reasonable probability of eventual success in the litigation, and (2) that it will be irreparably injured . . . if relief is not granted . . . . [In addition,] the district court, in considering whether to grant a preliminary injunction, should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest.

*Reilly v. City of Harrisburg*, 858 F.3d 173, 176 (3d Cir. 2017), *as amended* (June 26, 2017) (quoting *Del. River Port Auth. v. Transamerican Trailer Transport, Inc.*, 501 F.2d 917, 919–20 (3d Cir. 1974)) (alterations in original). "Generally, the moving party must establish the first two factors and only if these 'gateway factors' are established does the district court consider the remaining two factors." *Greater Philadelphia Chamber of Commerce*, 949 F.3d at 133 (quoting *Reilly*, 858

11

facially discriminate, Palisade is unlikely to succeed on the merits. The District Court accordingly erred in granting the preliminary injunction.

## A.

### 1.

"The Fair Housing Act ('FHA'), passed by Congress as Title VIII of the Civil Rights Act of 1968, prohibits housing discrimination on the basis of, *inter alia,* race, gender, and national origin"—and, following the adoption of the FHAA in 1988, individuals with disabilities.[22] FHAA claims may "be brought against municipalities and land use authorities."[23] Pursuant to the FHAA, it is unlawful:

> To discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of—

F.3d at 179). "The court then determines 'in its sound discretion if all four factors, taken together, balance in favor of granting the requested preliminary relief.'" *Id.* (quoting *Reilly*, 858 F.3d at 179).

[22] *Cmty. Servs., Inc. v. Wind Gap Mun. Auth.*, 421 F.3d 170, 176 (3d Cir. 2005) (citing 42 U.S.C. § 3601 *et seq.*).

[23] *Id.* (citing *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment,* 284 F.3d 442 (3d Cir. 2002)).

(A) that person; or

(B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or

(C) any person associated with that person.[24]

Under the FHAA, "handicap" means "a physical or mental impairment which substantially limits one or more of [a] person's major life activities."[25]

"Plaintiffs alleging violations of the FHAA under these sections may bring three general types of claims: (1) intentional discrimination claims (also called disparate treatment claims) and (2) disparate impact claims, both of which arise under § 3604(f)(2), and (3) claims that a defendant refused to make 'reasonable accommodations,' which arise under § 3604(f)(3)(B)."[26]

Here, we consider the first of these theories, the only one reached by the District Court. "Generally, to prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a 'motivating factor' behind

---

[24] 42 U.S.C. § 3604(f)(2).

[25] 42 U.S.C. § 3602(h)(1).

[26] *Wind Gap*, 421 F.3d at 176 (citing *Lapid-Laurel,* 284 F.3d at 448 n.3).

the challenged action."[27] "To evaluate these claims under the FHAA, courts have typically adopted the analytical framework of their analogues in employment law, including their coordinate burden-shifting analyses once plaintiff has made a prima facie showing of discrimination under a specific claim."[28] "The discriminatory purpose need not be malicious or invidious, nor need it figure [sic] 'solely, primarily, or even predominantly' into the motivation behind the challenged action."[29]

2.

Absent any formal request by Palisade for a variance, Palisade's likelihood of success on the merits turns on whether the City's zoning ordinance discriminates on its face. Accordingly, "we must examine the language of the challenged regulation or policy, aided, if applicable, by any evidence of record that informs the analysis."[30]

"[W]here a plaintiff demonstrates that the challenged action involves disparate treatment through

---

[27] *Id*. at 177 (citing *Cmty. Hous. Trust v. Dep't of Consumer & Regulatory Affairs,* 257 F. Supp. 2d 208, 225 (D.D.C. 2003) ("It is well settled that a defendant's decision or action constitutes disparate treatment, or intentional discrimination, when a person's disability was a 'motivating factor' behind the challenged action or decision.")).

[28] *Id.* at 176.

[29] *Id.* at 177 (quoting *Cmty. Hous. Trust*, 257 F. Supp. 2d at 225).

[30] *Id*. at 179.

14

explicit facial discrimination, or a facially discriminatory classification, a plaintiff need not prove the malice or discriminatory animus of a defendant," because "the focus is on the explicit terms of the discrimination."[31] "Put another way, direct evidence of intent is 'supplied by the policy itself.'"[32]

"[T]he most fundamental element of [a facially discriminatory classification] claim is that plaintiff must demonstrate that defendant's alleged discrimination was 'because of a handicap.'"[33] The operative question becomes "whether 'handicapped' or 'disabled' status—the protected trait under the FHAA—was being used as the *basis* for different treatment."[34] "Where a regulation or policy facially discriminates on the basis of the protected trait, in certain circumstances it 'may constitute per se or explicit . . . discrimination because 'the protected trait *by definition* plays a role in the decision-making process, inasmuch as the policy *explicitly* classifies people *on that basis*.'"[35] Generally

---

[31] *Id.* at 177 (internal quotation marks and citations removed).

[32] *Hassan v. City of New York*, 804 F.3d 277, 295 (3d Cir. 2015), *as amended* (Feb. 2, 2016) (quoting *Massarsky v. Gen. Motors Corp.,* 706 F.2d 111, 128 (3d Cir. 1983) (Sloviter, J., dissenting)).

[33] *Wind Gap*, 421 F.3d at 178 (quoting 42 U.S.C. § 3604(f)(2)).

[34] *Id.*

[35] *Id.* at 177 (quoting *DiBiase v. SmithKline Beecham Corp.,* 48 F.3d 719, 726 (3d Cir. 1995)) (internal quotation marks omitted) (emphasis added) (alteration in original).

applicable regulations, even those that expressly include protected classes or their proxies, in contrast, do not discriminate on their face, unless the "different treatment . . . was necessarily 'disability based.'"[36]

**B.**

Applying these principles, the City's zoning ordinance does not discriminate on its face, for two independent reasons. First, assisted living facilities are not identified on the ordinance's face in the relevant R-AAA section, the proper scope of our inquiry. Second, even if considered, the RIM zone's allowance of assisted living facilities as of right does not render the ordinance facially discriminatory. Pursuant to the analysis that follows, whether taking language of the R-AAA or RIM zones alone, or the terms combined, the zoning ordinance does not facially discriminate.

1.

Palisade, recognizing the absence of textual references to assisted living facilities in the R-AAA zone, urges that we broaden our focus and conclude that the zoning ordinance is facially discriminatory, because the zoning ordinance explicitly names assisted living facilities elsewhere and does not permit them by right in the R-AAA zone. We reject this approach and direct our inquiry to the "language of the challenged regulation or policy,"[37] which is the R-AAA zone, and not the RIM zone.

---

[36] *Id.* at 179.
[37] *Wind Gap*, 421 F.3d at 179.

While we acknowledge the proposition that ordinances "be read in their entirety,"[38] and that we can certainly look to other sections of the zoning ordinance or "any evidence of record that informs the analysis," we cannot import an explicit classification where none otherwise exists.[39] This follows directly from our teaching that "the focus is on the explicit terms of the discrimination," that is, the different treatment on account of the policy's "explicit[] classifi[cation] on th[e] basis" of a protected trait.[40] We also read from *Wind Gap* a focus on "the relevant regulation[s]" as the source of the different treatment.[41]

We accordingly focus on the language of the R-AAA zone that actually prohibits Palisade's proposed development. In the absence of any language referring to individuals with disabilities, the language of the R-AAA does not facially discriminate in violation of the FHAA.[42]

---

[38] Appellee Br. at 18 (quoting *In re Petition for Referendum on City of Trenton Ordinance 09- 02*, 990 A.2d 1109, 1115 (N.J. 2010) (per curiam)); *see also Food & Drug Admin. v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 133 (2000).

[39] *Wind Gap*, 421 F.3d at 179.

[40] *Id.* at 177-78 (internal quotation marks and citations omitted).

[41] *Id.* at 184.

[42] We also observe that the list of included uses does not suggest the specific and deliberate omission of assisted living facilities.

2.

But even if we consider the language of the RIM zone, and accept, despite our reservations, Palisade's equating assisted living facilities with persons with disabilities, we are unable to discern discrimination on the face of the ordinance under our jurisprudence.[43]

*i.*[44]

The District Court reasoned that the explicit inclusion of assisted living facilities only in the RIM zone necessarily

[43] *Wind Gap*, 421 F.3d at 179.

[44] The parties appear to agree that the term "assisted living facility" is an explicit reference to the disabled, rather than a neutral term. *See, e.g.,* Appellant Reply Br. at 18. We are not entirely persuaded that "assisted living facility" necessarily means a facility for a person with "(1) a physical or mental impairment which substantially limits one or more of [that] person's major life activities, (2) [and] a record of having such an impairment, or (3) [who is] . . . regarded as having such an impairment[,]" *Wind Gap*, 421 F.3d at 179 (quoting 42 U.S.C. § 3602(h)), and, thus, "coincide[s]" with the FHAA's definition of "handicap." *Id.* However, we will follow the parties' lead and assume their understanding of the term "assisted living facility" is correct. As a result, we need not consider whether, even if not an explicit reference to the disabled, "assisted living facility" is a "proxy" for that group. *See id.* at 177-78.

18

excluded them from the City's single-family district.[45] We are not so sure. While we will readily allow that the explicit inclusion of "assisted living facilities" as a permitted use in the RIM zone supports the inference that "assisted living facilities" are not a permitted use in the R-AAA zone, it does not in itself restrict land use in the R-AAA zone. Failure to permit a land use as of right is not tantamount to an express prohibition, and indeed the terms of the RIM zone on their face do not purport to allow, restrict, or otherwise regulate "assisted living facilities" in any other zone, including the R-AAA zone.[46] Thus, only the beneficial, preferential treatment of assisted living facilities finds itself in the explicit terms of the ordinance, while under Palisade's theory, the negative,

---

[45] *Palisade*, 2019 WL 5078865, at \*9 (the City intentionally "creat[ed] the RIM district as the exclusive zone where the handicapped elderly could receive assistance in a congregate setting.") (internal quotation marks and citation omitted); *see Grancagnola v. Planning Bd. of Twp. of Borough of Verona*, 533 A.2d 982, 985 (N.J. App. Div. 1987) (construing "commercial uses" to exclude "retail stores" because code "treat[ed] retail stores as a separate category of use" with "separate, specific authorization . . . in several zones."); 1 Rathkopf's The Law of Zoning and Planning § 5:18 (4th ed. 2020) ("[T]he legislative intent to exclude a use in one district is emphasized by the inclusion of the use as a specifically permitted use under another classification.").

[46] *Cf. Montana Fair Hous., Inc. v. City of Bozeman*, 854 F. Supp. 2d 832, 837 (D. Mont. 2012) ("Assisted Living/Elderly Care Facilities" denoted as a use "not permitted" in relevant zone by a "—").

19

restrictive treatment must be inferred, however logically.[47] Accordingly, the language of the RIM zone, though it explicitly includes the term "assisted living facilities," is not sufficient to find facial discrimination.

The immateriality of the RIM zone to the challenged regulation at issue is best illustrated by a counterfactual. If we were to conclude that the interaction of language in the RIM and R-AAA zones *did* improperly discriminate against individuals with disabilities, we would be left with the possibility that the removal of preferential treatment for assisted living facilities in another zone would validate or otherwise cure the zoning ordinance's facial discrimination. At best, the RIM zone can only contextualize the terms of the R-AAA zone.

Our prior mandate to focus "on the explicit terms of the discrimination" further underscores how Palisade's focus on the RIM zone misses the point.[48] Most relevant to our inquiry,

---

[47] This conclusion is consistent with the teaching of the Supreme Court in a parallel context, which has instructed that "[t]he force of any *negative implication* . . . depends on context" and "applies only when circumstances support[] a sensible inference." *N.L.R.B. v. SW Gen., Inc.*, 137 S. Ct. 929, 940 (2017) (internal quotation marks and citation omitted) (emphasis added) (alteration in original). From this, we discern two key principles. First, context matters. Second, the application of this rule is merely an implication, and not explicit discrimination on the face of the policy.

[48] *Wind Gap*, 431 F.3d at 177 (internal quotation marks and citation omitted).

the terms of the R-AAA zone itself and its permitted land uses are plainly inconsistent with "assisted living facilities" of the type that Palisade seeks to develop, and the City acknowledges as much. The District Court's inference of different treatment of Palisade's proposed assisted living facility in the R-AAA zone was thus sensible,[49] but it is not in itself sufficient to make out a facial discrimination claim.

These terms alone are indeed enough to restrict the development of the proposed assisted living facility. But the very fact that the terms of the R-AAA zone restrict the types of development there does not mean that they discriminate on their face in the absence of any invocation of the protected class. Different treatment of the proposed development under the zoning ordinance is necessary but not sufficient. Where we differ from the District Court, then, is in its conclusion that the different treatment was "because of" a protected class. Such a reading is not apparent from the text of the R-AAA zone, which does not even mention assisted living facilities or persons with disabilities.

*ii.*

Nor do the terms of the R-AAA zone *together* with the RIM zone create discrimination on the face of the ordinance. The mere fact that some general terms in the ordinance operate

---

[49] *See* 1 Rathkopf's The Law of Zoning and Planning § 5:18 (4th ed. 2020) ("Where [an] ordinance states that no land or building may be used except for those uses specified, the listing of permissive uses necessarily implies the exclusion of others.").

21

to disallow assisted living facilities and other terms expressly permit assisted living facilities as of right in another district, does not transform the ordinance into one that discriminates on its face. Palisade cannot bootstrap otherwise facially neutral restrictions into express discrimination. To conclude otherwise could render a zoning ordinance facially discriminatory if it (1) enumerates exclusive allowable uses, (2) does not expressly permit a use associated with a protected class, and (3) elsewhere even mentions that use. Such a result would read out the FHAA's requirement that the restriction must be "because of" discrimination.

The expressly permitted land uses in the R-AAA zone nowhere mention disability or assisted living facilities and are not inconsistent with uses by individuals both with and without disabilities. Similarly, Palisade's proposed assisted living facility is but one of many land uses prohibited in the R-AAA zone. There is no indication that disabled status, rather than, for example, the building size or the commercial character of the development, is the dispositive trait, singled out for different treatment.

Palisade argues that these restrictions make it all but impossible for their proposed business to operate in the R-AAA zone, adversely affecting the individuals with disabilities. And that may be so. But this argument is not a claim that the City's zoning ordinance discriminates on its face against individuals with disabilities. Rather, it is a claim that the facially neutral commercial and use restrictions in the R-AAA zone, by preventing the development of commercial assisted living facilities, disproportionately limits housing access for individuals with disabilities. This argument, then,

22

appears to be more in line with a disparate impact claim, which is not currently before the Court.[50]

3.

Our conclusion that the City's ordinance is not facially discriminatory does not necessarily spell the end of Palisade's proposed project.[51]  As we have noted, "under New Jersey law, developers of group homes for the handicapped (including the elderly) may apply for use variances as an 'inherently beneficial use' in any zone."[52]

---

[50] *Lapid-Laurel*, 284 F.3d at 466.

[51] We note that the outcome we reach here is consistent with our holding in *Lapid-Laurel*.  *Lapid-Laurel* involved a disparate impact challenge under the FHAA to a township's zoning system that, like the City's, only allowed the contemplated development (*i.e.*, senior housing) in a single, non-residential zone as of right.  *Id.* at 467.  We held that the plaintiff's exclusive reliance on the zoning system's designation of a single area for "senior housing" did not make out a prima facie case of disparate impact (*i.e.,* it did not establish that the zoning system had a greater adverse impact on the elderly handicapped than on other constituencies).  *Id.*  Because no facial challenge was raised to the zoning ordinance at issue in *Lapid-Laurel*, it is readily distinguishable from this case and is not controlling.  Nevertheless, because the plaintiff in *Lapid-Laurel* appears to have relied solely on the language of the zoning system at issue, our holding in that case may highlight the facial neutrality of the City's ordinance at issue here.

[52] *Id.* at 467.

Accordingly, Palisade has not shown a likelihood of success on the merits, and the District Court erred in granting the preliminary injunction.[53]

## III.

Because we conclude that the City's ordinance does not discriminate against individuals with disabilities on its face, we will vacate the District Court's order granting the preliminary injunction and remand for further proceedings.

---

[53] Having determined that the ordinance does not facially discriminate, we need not address the remaining equitable factors for injunctive relief. *Fulton v. City of Phila.*, 922 F.3d 140, 165 (3d Cir. 2019), *cert. granted* 140 S. Ct. 1104 (2020).