Eagle Run Holdings, LLC, : 
              Appellant : 
               : 
      v. : 
               : 
The Zoning Hearing Board : No. 222 C.D. 2022 
of the City of Reading : Argued: June 5, 2023

BEFORE:    HONORABLE ANNE E. COVEY, Judge 
               HONORABLE MICHAEL H. WOJCIK, Judge 
               HONORABLE CHRISTINE FIZZANO CANNON, Judge

OPINION NOT REPORTED

MEMORANDUM OPINION 
BY JUDGE FIZZANO CANNON          FILED: July 6, 2023

      Eagle Run Holdings, LLC (Eagle Run), appeals from the February 8, 2022, opinion and order of the Court of Common Pleas of Berks County (trial court), which upheld the Zoning Hearing Board of the City of Reading's (Board) denial of Eagle Run's application to operate a group home for disabled individuals in a residential district. Upon review, we affirm.

## I. Background

      On March 24, 2020, Eagle Run submitted a zoning permit application for a group home to the City of Reading's Zoning Office concerning property Eagle Run owned at 1916 Olive Street, which is in the City's R-1 residential zoning district

and the Heights Conservation District.[1]   Reproduced Record (R.R.) at 4 & 6.[2]

Section 802 of the City's Zoning Ordinance (Ordinance),[3] which governs the R-1

district, allows one-family detached dwellings as a permitted-by-right use.

Ordinance § 600-802(B)(1)(b).  Group homes[4] are not included as either a permitted-

by-right use or a conditional use in the R-1 district.  *See* Ordinance § 600-

802(B)(4)(a) (listing only "student home"[5] as a conditional use limited to existing

lawful apartment dwellings).  Group homes are allowed as a conditional use in the

---

[1] The parties at times also refer to Section 801 of the City's Zoning Ordinance (Ordinance), which is the designation for the R-1A residential district, an area with larger lot sizes.  The R-1 and R-1A districts both allow "one-family detached dwellings" as a permitted-by-right use and do not list "group care homes" as a conditional use.  We will refer to Section 802 since there is no dispute that the property is within the R-1 (rather than R-1A) district.

[2] As Eagle Run failed to paginate the reproduced record in accordance with Pennsylvania Rule of Appellate Procedure 2173, citations to the reproduced record reflect electronic pagination for ease of reference.

[3] Adopted by the City Council of the City of Reading on July 26, 2010 by Ordinance No. 47-2010 (Ch. 27 of the 2001 Code of Ordinances).

[4] The Ordinance defines a "group care facility" as follows:

> A household facility of no more than nine persons, other than persons related by blood, marriage, adoption or legal guardianship, who because of their physical or emotional condition or their social or interpersonal skills otherwise would limit, inhibit or prevent their ability to function as useful or productive members of society, are provided supportive services and supervision through a nonprofit social service agency or other established entity. This use is also known as a "group home." This use shall not include a treatment center.

Ordinance § 600-2202.

[5] The Ordinance defines a "student home" as "[a] living arrangement for at least two students, up to a maximum of three students . . . and who are unrelated to each other by blood, marriage or legal adoption. . . .  This term shall not include one or more students living in the same dwelling as their parent."  Ordinance § 600-2202.

R-2 and R-3 residential districts, which are more diverse but still allow detached one-family homes as a permitted-by-right use along with one-family[6] semi-detached and attached dwellings. *See* Ordinance §§ 600-803(B)(4)(a) & 600-804(B)(3)(b).

The application sought a permit for a group home for two unrelated disabled residents to live on the property. R.R. at 4. On April 9, 2020, the City's Zoning Administrator denied the application, stating that group homes are "not among the permitted uses in the R-1 district." *Id*. at 6-7. Eagle Run appealed to the Board, asserting that the prohibition on group homes in the R-1 district discriminated against the disabled and violated the federal Fair Housing Amendments Act of 1988 (Fair Housing Act), 42 U.S.C. §§ 3601-3631.[7] R.R. at 14.

---

[6] The Ordinance defines "family" as:

> One or more persons related by blood, marriage, adoption or foster relationship, legal custody, guardianship or written permission of a person with custody or are the great- grandparent, great-grandchild, grandparent, grandchild, parent, child, brother, sister, aunt, uncle, niece, nephew, great uncle, great aunt, great nephew or great niece, living together as a single housekeeping unit; or a group of not more than three unrelated persons over the age of 14 years, who are living together in a single dwelling unit and maintaining a common household with a single cooking facility.

Ordinance § 600-2202. However, the definition adds as an exception that "[s]hared housing arrangements, where the individuals are permanent or temporary 'roommates,' do not constitute family arrangements." *Id*. As will be addressed below, Eagle Run did not argue to either the Board or the trial court that its residents should be considered a family, and its argument to this Court in that regard is therefore waived.

[7] There is no dispute here that the trial court, as opposed to the City's Human Relations Commission (Commission), had jurisdiction to address Eagle Run's claims. However, Eagle Run would not have been able to bring this claim as an affirmative matter through the Commission. The Commission does have jurisdiction to address allegations of unlawful housing practices brought against real estate owners, brokers, or any "person." City Code § 23-507. However, the Board is neither an owner nor a broker, and as a governmental entity, it does not fit within Chapter 23's definition of "person": "Any individual, partnership, corporation, labor organization or other organization or association including those acting in a fiduciary or representative capacity, whether

3

A video hearing was held on November 18, 2020. Original Record (O.R.) #2 Ex. C (Transcript). Gabriel Dalfin, Eagle Run's principal, testified as follows. Eagle Run is a real estate company that leases properties to CareSense Living, which operates group homes; Dalfin has an ownership share in CareSense. *Id*. at 24-25 & 32. The property has a one-family detached dwelling that has been used since May 2019 as a group home for two unrelated women with disabilities who pay rent to CareSense. *Id*. at 11-14 & 28-30. One is blind and can hear but does not speak; she uses sign language to communicate with others and has family members in Reading. *Id*. at 22. The other has no physical disabilities but needs assistance to "make good choices" and not "hang out with the wrong people." *Id*.

Dalfin stated that according to the individuals' service plans, help is needed on a 24/7 basis, but one aide at a time can serve both residents. Transcript at 23-24. The aides do not live in the home but drive and park there for shifts. *Id*. at 13-14. Dalfin had not been to the property since it became a group home but was unaware of any complaints to the Board about it. *Id*. at 29 & 34-35. He believed that the impact on the neighboring community was no greater than if two non-disabled people resided on the property and that the denial of Eagle Run's application discriminated against the disabled residents in violation of the Fair Housing Act. *Id.* at 14-16. He did not know until he received the denial letter that the R-1 district does not allow group homes. *Id*. at 28.

Robert Wambold, who lives on the same block as the property, testified that the property's grass and shrubbery were not maintained, that a lot of different cars were coming and going from it, and that there were often more than two cars at

appointed by a court or otherwise. The term 'person,' as applied to partnerships or other organizations or associations, includes their members, and as applied to corporations, includes their officers." City Code § 23-503.

a time blocking the sidewalk so pedestrians with strollers, dogs, or wheelchairs were forced to detour into the street. Transcript at 39-40. Wambold averred that the group home was started "under the radar" without any notice to the neighbors and without first checking the zoning status, which would have shown that group homes are not allowed in the R-1 district. *Id*. at 41. James and Carolyn Mann, who live across the street at 1909 Olive Street, added that their attempts to contact CareSense were ignored. *Id*. at 42-44.

Linda Kelleher, president of the College Heights Community Council, testified that the group home had a disruptive impact on the immediate area. Transcript at 45-46. She believed Eagle Run "slipped in" the group home without checking whether it was permitted in the district and "hoped they would not get caught." *Id*. at 46. She noted that if Eagle Run's application for a group home is approved, the permission could last beyond the current residents' tenure and that future residents could need even more accommodations and cause more disruption to the area.

On December 9, 2020, the Board issued a unanimous decision upholding the Zoning Administrator's denial of Eagle Run's application. R.R. at 30-33. The Board concluded that the proposed use was not compliant with the Ordinance, that it would be a detriment to the health, safety, and welfare of the neighborhood, and that the sole basis for the requested relief was financial in nature. *Id*. at 31-33.

Eagle Run appealed to the trial court, which conducted oral argument and accepted briefing, but did not take any new evidence before affirming in a February 8, 2022, opinion and order. R.R. at 36-50. The trial court first concluded that the mere fact that Section 802 does not expressly exclude group homes, which

5

are expressly permitted in other residential districts, did not amount to intentional disparate treatment of the disabled. *Id*. at 45. The trial court next concluded that Section 802 did not disparately impact the disabled, noting that the plaintiff's burden of proof under the Fair Housing Act requires some evidence of such impact and Eagle Run had produced none. *Id*. at 46. The trial court next held that Eagle Run failed to present evidence that the Board's denial of its application amounted to a failure to reasonably accommodate the disabled. *Id*. at 47-48. The trial court added that even if Eagle Run had met its burden, the Board's decision rested on evidence that due to the consistently poor condition of the property's exterior and the parking violations, both of which created health and safety risks, Eagle Run's request for accommodation was unreasonable.[8] *Id*. at 48. Eagle Run thereafter appealed to this Court.

## II. Discussion

On appeal, Eagle Run argues that Section 802 of the Ordinance, which does not allow group homes as a permitted-by-right use or otherwise in the R-1 district, violates the Fair Housing Act on both facial and as-applied bases.[9]

## A. Fair Housing Act

Section 3604(f)(1) of the Fair Housing Act states that "it shall be unlawful . . . [t]o discriminate in the sale or rental, or to otherwise make unavailable

---

[8] These proffered grounds for the Board's decision are questionable, as they relate to property maintenance and parking issues rather than zoning. However, Eagle Run has not appealed on that basis.

[9] In a land use appeal where the trial court does not take additional evidence, the appellate scope of review is limited to determining whether the local governing body committed an error of

or deny, a dwelling to any buyer or renter because of a handicap of--(A) that buyer or renter[;] (B) a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available; or (C) any person associated with that buyer or renter." 42 U.S.C. § 3604(f)(1). Moreover, "[f]or purposes of this subsection, discrimination includes--a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling[.]" 42 U.S.C. § 3604(f)(3)(B).

The Fair Housing Act also states that "any law of a State, a political subdivision, or other such jurisdiction that purports to require or permit any action that would be a discriminatory housing practice under this subchapter shall to that extent be invalid." 42 U.S.C. § 3615; *see Evans v. Zoning Hearing Bd. of Borough of Spring City*, 732 A.2d 686, 693 (Pa. Cmwlth. 1999) (holding that municipal zoning ordinances are subject to the Fair Housing Act). Zoning authorities are not permitted to leave disabled individuals with no alternative other than to live outside of a residential area. *McKivitz v. Twp. of Stowe*, 769 F. Supp. 2d 803, 826 (W.D. Pa. 2010). "It does not follow, however, that the [Fair Housing Act] provides handicapped individuals with the prerogative to live in a particular home of his or her choosing, regardless of the applicable zoning regulations." *Id*. at 826-27 (stating that the disabled cannot be excluded from one-family neighborhoods, but this does not mean that such persons have "carte blanche to determine where and how they would live regardless of zoning ordinances to the contrary").

---

law or an abuse of discretion. *EQT Prod. Co. v. Borough of Jefferson Hills*, 208 A.3d 1010, 1024-25 (Pa. 2019). Our review of whether the governing body committed an error of law is conducted *de novo* and we are not bound by the legal conclusions of the governing body or the trial court. *Id*. An abuse of discretion will be found only when the findings of the governing body are not supported by substantial evidence. *Id*. Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Id.*

7

## B. City of Reading Zoning Ordinance

The R-1 district is characterized in the Ordinance as follows:

A. The Residential Districts are intended to provide sufficient area in appropriate locations for residential uses and development in an effort to meet the housing needs of the City without sacrificing desirable established residential patterns.

(1) The R-1A, R-1, R-2 and R-3 Residential Districts allow for varying residential densities. The R-1A and R-1 Districts preserve and enhance low-density areas composed of one-family detached dwellings on relatively large lots. The R-2 Medium Density District provides a variety of one-family detached, semidetached and attached dwellings. The R-3 District allows the highest residential densities and permits multifamily apartments.

Ordinance § 600-702(A).

Section 802 of the Ordinance sets forth the use parameters for the R-1 district:

B. Allowed uses.

(1) Permitted-by-right uses.

(a) Gardens, crop farming and forestry.

(b) One-family detached dwelling.

(c) Public parks, nature preserves and nonmotorized recreation trails.

. . . .

(3) Special exception uses. In compliance with § 600-1202 ["Conditions for special exception uses" as allowed in various districts].

(a) Bed-and-breakfast inn.

8

(b) Home occupations, major: in compliance with § 600-1006.

(c) Tower-based [wireless communication facilities], including poles that are located within 500 feet of a residential property or within a setback area, subject to Part 21 of this chapter.

(4) Conditional use. In compliance with § 600-1203 ["Conditions for conditional uses" as allowed in various districts].

(a) Student home, which shall only be allowed in an existing lawful apartment dwelling.

Ordinance § 600-802 (A)(1), (3), (4).[10]

The Ordinance defines a "group-care facility," which is synonymous with "group home," as follows:

> A household facility of no more than nine persons, other than persons related by blood, marriage, adoption or legal guardianship, who because of their physical or emotional condition or their social or interpersonal skills otherwise would limit, inhibit or prevent their ability to function as useful or productive members of society, are provided supportive services and supervision through a nonprofit social service agency or other established entity. This use is also known as a "group home." This use shall not include a treatment center.

Ordinance § 600-2202.

## C. Fair Housing Act Analysis

Plaintiffs may bring three different types of claims against land use authorities under the Fair Housing Act: (1) intentional discrimination claims, also called disparate treatment claims; (2) disparate impact claims; and (3) claims that

---

[10] Student homes in the R-1 district are limited to apartment dwellings occupied by students enrolled in a college, university, or trade school. Ordinance § 600-2202 ("Definitions").

the municipal authority failed to "make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling." *Lapid-Laurel, L.L.C. v. Zoning Bd. of Adjustment of Twp. of Scotch Plains*, 284 F.3d 442, 448 n.3 (3d Cir. 2002).

## 1. Intentional Discrimination/Disparate Treatment

In the context of the Fair Housing Act, "to prevail on a disparate treatment claim, a plaintiff must demonstrate that some discriminatory purpose was a motivating factor behind the challenged action." *431 E. Palisade Ave. Real Est., LLC v. City of Englewood*, 977 F.3d 277, 284 (3d Cir. 2020) (internal quotation marks omitted). "The discriminatory purpose need not be malicious or invidious, nor need it figure solely, primarily, or even predominantly into the motivation behind the challenged action." *Id*.

Eagle Run's statement of errors pursuant to Pennsylvania Rule of Appellate Procedure 1925(b) and the questions presented in its brief assert identically that Section 802 of the Ordinance, which governs the R-1 district, violates the Fair Housing Act's prohibition on disparate treatment of the disabled. O.R. # 13 & Eagle Run's Br. at 8. However, Eagle Run's brief focuses entirely on disparate impact and reasonable accommodation. Pursuant to Pennsylvania Rule of Appellate Procedure 2119(a), a party's failure to develop an issue in the argument section of its brief constitutes waiver of the issue. *In re Condemnation ex rel. Com., Dep't of Transp.*, 76 A.3d 101, 106 (Pa. Cmwlth. 2013). We therefore conclude that Eagle Run has waived any arguments it may have as to disparate treatment.

## 2. Disparate Impact

Unlike the analysis for disparate treatment, consideration of whether a zoning provision creates a disparate impact on the disabled does not require evidence of discriminatory intent. *Lapid-Laurel*, 284 F.3d at 466. Nor does this analysis entail consideration of the ordinance text as, by nature, disparate impact presupposes facially neutral enactments or actions. *Id.* at 467. In order to succeed, a plaintiff must first make a *prima facie* case of disparate impact under the Fair Housing Act.[11] The plaintiff must show that the facially neutral provision or action of the locality had a greater adverse impact on the disabled than on others. *Id.* at 466-67.

"Typically, a disparate impact is demonstrated by statistics, and a *prima facie* case may be established where gross statistical disparities can be shown." *Oxford Investments, L.P. v. City of Phila.*, 21 F. Supp. 3d 442, 457 (E.D. Pa. 2014). In the absence of statistics, the plaintiff must at least demonstrate proof of the alleged disparate impact in a "plausibly measured way." *Allentown Victory Church v. City of Allentown*, ___ F. Supp. 3d ___, ___ (E.D. Pa. 2022), 2022 WL 4071851, at *8. Allegations devoid of evidence, such as a pattern of denials of permits for group homes, will be insufficient to establish a plaintiff's *prima facie* case. *Id.* at ___, 2022 WL 4071851 at **8-9; *see also Oxford Investments*, 21 F. Supp. 3d at 457 (concluding that plaintiff's "unsupported assertions" were "simply insufficient to state *prima facie* claim for disparate impact discrimination"). If the plaintiff establishes a *prima facie* case, then the burden shifts to the defendant to show that it

---

[11] Eagle Run argues that the local government entity bears the initial burden of proof to show that its policy does not discriminate, but case law is clear that the plaintiff must first make out a *prima facie* case of disparate impact. *Lapid-Laurel*, 284 F.3d at 466-67 (italics added).

11

had a legitimate, non-discriminatory reason for the action and that no less discriminatory alternatives were available. *Lapid-Laurel*, 284 F.3d at 467.

As noted, Section 802 of the Ordinance, which governs the R-1 district, allows one-family detached dwellings as a permitted-by-right use. Ordinance § 600-802(B)(1)(b). Group homes are not included as either a permitted-by-right or a conditional use in the R-1 district. *See* Ordinance § 600-802(B)(4)(a) (listing only "student home" as a conditional use). Group homes are allowed as a conditional use in the R-2 and R-3 districts, which are more diverse but still allow one-family dwellings as a permitted-by-right use. *See* Ordinance §§ 600-803(B)(4)(a) & 600-804(B)(3)(b).

Eagle Run argues that the Ordinance's exclusion of group homes from the R-1 district results in an adverse disparate impact on the group home's two disabled residents in violation of the Fair Housing Act. Eagle Run's Br. at 5-6. According to Eagle Run, the fact that it was even required to seek out a permit for use of the property as a group home while other potential residents of the R-1 district are not required to do so is part of the discriminatory impact. *Id*. at 9-10. Eagle Run also posits that the Ordinance is discriminatory because it bars disabled individuals from living in "the most desirable single-family district in the city." *Id*. at 5.

The Board responds that the Ordinance's limitations on residential uses in the R-1 district do not discriminate against the disabled because the R-1 designation also omits other kinds of non-family groups, such as roommates,[12] that are expressly permitted in the more diverse R-2 and R-3 districts. Board's Br. at 12.

---

[12] As noted above, while "a group of not more than three unrelated persons over the age of 14 years, who are living together in a single dwelling unit and maintaining a common household with a single cooking facility" may constitute a "family," roommates "do not constitute family arrangements" in the Ordinance. Ordinance § 600-2202 (definition of "family" and exceptions thereto).

As a further example, nursing homes are allowed as a special exception use in the R-2 and R-3 districts, but not at all in either the R-1A or R-1 districts. *See* Ordinance §§ 600-803(B)(3)(h) & 600-804(B)(4)(j). The Board notes that Eagle Run could have sought approval of the group home through the variance process but failed to do so. *Id*. at 6. The Board adds that Eagle Run failed to present any actual evidence at the hearing and that the mere assertion that the R-2 and R-3 districts may be less desirable than the R-1 district is not a basis for a finding of disparate impact. *Id*. at 13-14.

The Board's opinion did not address Eagle Run's Fair Housing Act allegations, but the trial court concluded that Eagle Run had proffered no evidence that Section 802 or the Board's denial of Eagle Run's group home application on the basis that it was incompatible with Section 802 created a disparate impact on the disabled. R.R. at 46. We agree. Eagle Run cited the Fair Housing Act in its appeal to the Board but presented no evidence (statistical or otherwise) that the R-1 district's non-inclusion of group homes created a greater adverse impact on the disabled than on others also not allowed to reside in the R-1 district, such as nursing home residents or other groups of individuals who do not constitute a family.

For example, Dalfin did not describe any problems or challenges that would result if the individuals relocated to the R-2 or R-3 districts where group homes are allowed as a conditional use. Although one of the residents has family in Reading, Dalfin did not indicate that they live in the immediate area or within the R-1 district such that moving the resident to another area zoned for group homes would adversely impact her. Because the R-2 and R-3 districts allow group homes as a conditional use, there is no evidence that the residents have nowhere else to live, as was the case in *Dr. Gertrude A. Barber Center, Inc. v. Peters Township*, 273 F. Supp.

13

2d 643, 655-560 (W.D. Pa. 2003), where the court found that exclusion of a proposed group home for the mentally disabled violated the Fair Housing Act because there was nowhere else in the township where the individuals could live. Moreover, Eagle Run presented no evidence to support its assertion that seeking a variance for the group home would be futile, such as records of other instances where a variance for a group home was sought and denied.

Eagle Run also cites no authority for its position that the desirability of the R-1 district alone is sufficient to determine that the Ordinance's otherwise neutral zoning rules barring group homes in that district disparately impacts the disabled. This Court is unaware of any such authority. In *Lapid-Laurel*, the court rejected the plaintiffs' disparate impact claims based on the alleged undesirability of the district in the township that allowed senior housing. 284 F.3d at 467-68. The court pointed out that the mere fact that the zoning scheme limited senior housing to one district did not establish a *prima facie* case of disparate impact, particularly because the plaintiffs could seek a low-burden variance in any district and because the plaintiffs failed to show evidence of a pattern or other conduct of disparate impact. *Id*.; *Cf. Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 158 n.13 (3d Cir. 2002) (holding that removal of ceremonial demarcation allowing Orthodox Jews to push and carry during Sabbath may have made that area "less desirable" for them but did not make housing within it unavailable or more difficult for them so as to support Fair Housing Act claim); *see also McKivitz*, 769 F. Supp. 2d at 826-27 (declining to find that the Fair Housing Act "provides handicapped individuals with the prerogative to live in a *particular* home of his or her choosing, regardless of the applicable zoning regulations") (emphasis in original).

14

Ultimately, all Eagle Run has proffered in support of its disparate impact claim are the kind of unsupported and conclusory allegations that courts have consistently found insufficient to establish a *prima facie* case of disparate impact in violation of the Fair Housing Act. *See Lapid-Laurel*, 284 F.3d at 467-68; *Allentown Victory Church*, ___ F. Supp. 3d at ___, 2022 WL 4071851, at **8-9; *Oxford Investments*, 21 F. Supp. 3d at 457. Eagle Run's as-applied challenge is therefore meritless.

To the extent Eagle Run presents a facial challenge in this context, we agree with the Board that in light of the exclusion of other non-family residential groups from the R-1 district, such as nursing home residents or other non-family groups of individuals, there is no basis for Eagle Run's assertion that as a facial matter, the R-1 classification discriminately impacts the disabled as opposed to non-disabled persons. *See Lapid-Laurel*, 284 F.3d at 466-67; *see also 431 E. Palisade Ave. Real Estate*, 977 F.3d at 287 (stating that "[t]he mere fact that some general terms in the ordinance operate to disallow assisted living facilities and other terms expressly permit assisted living facilities as of right in another district, does not transform the ordinance into one that discriminates on its face"). The trial court therefore did not err in concluding that Eagle Run failed to make a *prima facie* case in support of its disparate impact claim.[13]

### 3. Reasonable Accommodation

In addition to disparate treatment and impact, discrimination in the context of the Fair Housing Act includes "a refusal to make reasonable

---

[13] Because Eagle Run did not meet its burden to show *prima facie* evidence of disparate impact, the burden did not shift to the Board to show a legitimate, non-discriminatory reason for denying Eagle Run's permit application and that no less discriminatory alternatives were available other than denial of the permit application. *See Lapid-Laurel*, 284 F.3d at 467.

accommodations in rules, policies, practices, or services, when such accommodations may be necessary to afford such person equal opportunity to use and enjoy a dwelling." 42 U.S.C. § 3604(f)(3)(B). Cases addressing reasonable accommodations often include specific requests, such as requests for exclusive parking spaces, to install a new elevator, or for a waiver of pet policies for comfort animals. *See Gittleman v. Woodhaven Condo. Ass'n, Inc.*, 972 F. Supp. 894 (D.N.J. 1997) (parking space); *Congdon v. Strine*, 854 F. Supp. 355 (E.D. Pa. 1994) (elevator); *Kennedy House, Inc. v. Phila. Comm'n on Hum. Rels.*, 143 A.3d 476 (Pa. Cmwlth. 2016) (comfort animals). However, reasonable accommodations cases have also concerned zoning matters such as in *Lapid-Laurel*, where a developer sought a variance to build a nursing home in a zoning district that allowed only single-family houses. 284 F.3d at 447. The ability to live in a residential zone has been held necessary as a reasonable accommodation to achieve equal opportunity in housing for the disabled. *Id*. at 460.

"[T]he plaintiff bears the initial burden of showing that the requested accommodation is necessary to afford handicapped persons an equal opportunity to use and enjoy a dwelling, at which point the burden shifts to the defendant to show that the requested accommodation is unreasonable." *Lapid-Laurel*, 284 F.3d at 457. Additionally, evidence that a request for accommodation has been made and refused is relevant to this inquiry. *Congdon*, 854 F. Supp. at 363.

The Ordinance provides a process for the disabled to seek "a special exception allowing modifications to specific requirements of [the Ordinance] that the applicant proves to the satisfaction of the [Board] are required under applicable federal law to provide a reasonable accommodation to serve persons who the applicant proves have 'disabilities' as defined in and protected by such laws."

16

Ordinance § 600-1201(B). Applicants seeking reasonable accommodations "shall identify the disability which is protected by [the Fair Housing Act and] the extent of the modification of the provisions of [the Ordinance] necessary for a reasonable accommodation[.]" *Id.*; *see Carunchio v. Swarthmore Borough Council*, 237 A.3d 1183, 1199 (Pa. Cmwlth. 2020) (concerning a group home application for cancer patients and their caregivers and requesting revision of the ordinance's definition of "family" in order to provide the residents "both the comforts of home and a support network of other cancer patients and their caregivers").

Eagle Run asserts that the Ordinance's exclusion of group homes from the R-1 district violates the "reasonable accommodations" requirement of the Fair Housing Act. Eagle Run's Br. at 6-7 & 12. In this regard, Eagle Run's arguments are largely identical to its arguments concerning disparate impact: the mere fact that group home arrangements are not allowed as a permitted-by-right use or a conditional use in the R-1 district amounts to a failure by the City to reasonably accommodate Eagle Run's disabled residents. *See id.* at 12-13. Eagle Run relies on *Hovsons, Inc. v. Township of Brick*, 89 F.3d 1096, 1103 (3d Cir. 1996), for the premise that the entire burden is on the defendant to prove that a requested accommodation is unreasonable. Eagle Run also relies on *City of Edmonds v. Oxford House*, 514 U.S. 725 (1995), where the United States Supreme Court found that preservation of the family character of a residential neighborhood alone was an insufficient basis to refuse accommodation of a group home for 12 individuals (over the ordinance's maximum of 10) in substance abuse recovery.

The Board responds that Eagle Run neither asked for reasonable accommodations (beyond submitting its permit application) nor gave the Board or City an opportunity to make such accommodations (other than granting the

17

application outright). Board's Br. at 14. The Board adds that Eagle Run failed to meet its burden to present evidence that it was reasonable and necessary for Eagle Run's residents to live in the R-1 district. *Id*. at 14-16.

The Board's decision did not directly address Eagle Run's Fair Housing Act allegations, but the trial court concluded that Eagle Run failed to show necessity because group homes are allowed as conditional uses in other residential districts and Eagle Run failed to present evidence other than its assertion that the R-1 district was "better" than the other residential districts that allow group homes. R.R. at 48. The trial court added that even if Eagle Run had met its burden to show necessity, the objectors' evidence was sufficient for the Board to find that Eagle Run's request was unreasonable. *Id.* We are constrained to agree.

First, the Board is correct that Eagle Run failed to avail itself of the Ordinance's process to formally request a special exception for a reasonable accommodation under the Fair Housing Act. *See* Ordinance § 600-1201(B). The application did not cite or refer to the Fair Housing Act, identify the residents' disabilities, or specify the aspect of the Ordinance that required an accommodation. *See* R.R. at 4. However, the Fair Housing Act "does not require that a request be made in a particular manner or at a particular time"; the request must simply be made "in a manner that a reasonable person would understand to be a request for an exception, change, or adjustment to a rule, policy, practice, or service because of a disability." *Lloyd v. Presby's Inspired Life*, 251 F. Supp. 3d 891, 901 (E.D. Pa. 2017). Therefore, despite its formal deficiencies, Eagle Run's application for permission to operate a "group home" in the R-1 district may be construed as a request for a reasonable accommodation for disabled individuals that was denied when the Board rejected the application.

18

Next, we reject Eagle Run's reliance on *Hovsons* in support of its argument that the entire burden is with the Board to show that the requested accommodation (allowing a group home in the R-1 district) is unreasonable. In *Lapid-Laurel*, the court acknowledged that *Hovsons* governs the reasonability aspect of the inquiry, but concluded that the overall inquiry requires a burden-shifting approach:

> We think that a burden-shifting approach in which the plaintiff would first have the burden of demonstrating that the requested accommodation is necessary to create an equal opportunity, at which point the burden would shift to the defendant to show that the accommodation is unreasonable, makes sense from a policy standpoint.

> While a plaintiff is in the best position to show what is necessary to afford its clients (*i.e.*, the handicapped population that it wishes to serve) an equal opportunity to use and enjoy housing, a defendant municipality is in the best position to provide evidence concerning what is reasonable or unreasonable within the context of its zoning scheme.

284 F.3d at 457.

Here, Eagle Run failed to meet its initial burden to show that living in the R-1 district is necessary to afford its disabled residents a fair opportunity to use and enjoy housing in a residential area. Eagle Run's tenants are not barred from all one-family residential districts in the City because group homes are allowed as conditional uses in both the R-2 and R-3 districts, which both also allow one-family dwellings as permitted-by-right uses. Living in a particular residential district has not been found necessary when a locality's zoning scheme provides comparable residential opportunities elsewhere. Similar facts were present in *McKivitz*, where the court found the plaintiffs had not met their *prima facie* burden for a reasonable accommodation:

19

> Under Ordinance No. 912, "group residences" are allowed as a "conditional use" in R–2 and R–3 districts and as a "permitted use" in RC–2 districts. Single-family dwellings are permitted in each type of district. The Plaintiffs have presented no evidence concerning the availability (or unavailability) of group residences in Stowe Township, nor have they attempted to establish that, as a practical matter, no single-family dwellings are located in R–2, R–3 and RC–2 districts. *The Plaintiffs base their entire case on the unavailability of "group residences" in a single residential area of Stowe Township that happens to be zoned as an R–1 district.* In order to shift the burden of proving "unreasonableness" to the Defendants, the Plaintiffs must establish a nexus between the proposed accommodations and their necessity for providing handicapped individuals with an equal opportunity to live in a residential area of Stowe Township. *It does not suffice for them to show that the proposed accommodations are needed to enable handicapped individuals to live in a specific facility located within a particular residential district.* Because the Plaintiffs have failed to satisfy their initial burden of showing that "reasonable accommodations" are necessary to provide handicapped individuals with an "equal opportunity to use and enjoy a dwelling," the burden of demonstrating that the requested accommodations are "unreasonable" does not shift to the Defendants.

769 F. Supp. 2d at 827 (citations omitted). As such, Eagle Run's argument that the R-1 district is more desirable than the R-2 and R-3 districts, without more, did not establish necessity.

Eagle Run also did not present evidence that using the property as a group home was necessary for the property's financial viability or served a particular therapeutic purpose that could not be accomplished in the R-2 or R-3 district. *See Lapid-Laurel*, 284 F.3d at 461. Likewise, Eagle Run's reliance on *City of Edmonds* is misplaced; that case pertained to the reasonableness of the city's refusal to accommodate the group home, which is part of the second aspect of the burden-

20

shifting inquiry and was not reached here because Eagle Run did not meet its initial burden to show necessity. As with its disparate impact allegations, Eagle Run's argument on reasonable accommodations is limited to unsupported and conclusory allegations, lacking proof of necessity, which cannot establish a *prima facie* case of discrimination in violation of the Fair Housing Act. *See, e.g.*, *Allentown Victory Church*, ___ F. Supp. 3d at ___, 2022 WL 4071851, at *8; *Oxford Investments*, 21 F. Supp. 3d at 457. The trial court therefore did not err in concluding that Eagle Run failed to make a *prima facie* case for its disparate impact claim.[14, 15]

### D. Additional Discrimination Claims

It is well established that "a party has a duty to preserve an issue at every stage of a proceeding, [and] he or she also must comply with the general rule to raise an issue at the earliest opportunity." *In Re Petition to Set Aside Upset Tax Sale*, 218 A.3d 995, 998 (Pa. Cmwlth. 2019). Pennsylvania Rule of Appellate Procedure 302(a) provides: "Issues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). Similarly, Pennsylvania Rule of Appellate Procedure 1925(b)(4)(ii) requires that issues be

---

[14] Because Eagle Run did not meet its burden to show *prima facie* evidence that living in the R-1 district was necessary for its disabled tenants, the burden did not shift to the Board to show that allowing group homes in the R-1 district is unreasonable. *See Lapid-Laurel*, 284 F.3d at 457.

[15] Eagle Run also cites the federal Department of Housing and Urban Development's (HUD's) 2013 "Implementation of the Fair Housing Act's Discriminatory Effects Standard" ("2013 Rule") for the principle that the Board should bear the entire burden of proof with regard to Eagle Run's allegations of disparate treatment, disparate impact, and reasonable accommodations. Eagle Run's Br. at 8 (citing 78 F.R. 114460 (2020)). However, the 2013 Rule expressly approved the burden-shifting framework (used by the federal courts and here) with the plaintiff required to first establish a *prima facie* case of discrimination. 78 F.R. 114460 ("Executive Summary"). We note also that the most recent HUD Rule, which became effective in October 2020, just before the Board issued its decision in this case, retained the burden shifting structure including the plaintiff's *prima facie* requirement. *See* 85 F.R. 60288 (2020) ("Summary").

raised with "with sufficient detail" so that the trial court will be on notice of the appellant's claims. Pa.R.A.P. 1925(b)(4)(ii).

In addition to its discrimination claims based on the Fair Housing Act, Eagle Run argues in its brief to this Court that the Ordinance violates equal protection principles by treating the disabled residents of its group home differently from other residents in the R-1 district. Eagle Run's Br. at 6-7 & 13. Eagle Run further asserts that the trial court erred in failing to conclude that the two residents of its group home constituted a functioning "family unit" such that they should have been able to live in the R-1 district on a permitted-by-right basis because the Fair Housing Act bars discrimination based solely on family status. *Id*. at 14. The trial court did not address these claims.

In its entirety, Eagle Run's Rule 1925(b) statement reads as follows:

1. Does [Section 802 of the Ordinance] violate the [Fair Housing Act], based on the fact that "Group Homes" of any size or numbers of people are not an allowed use by right in the R-1 Residential District, nor is it a permitted accessory use, special exception or condition use according to the [Ordinance]"?

2. Does [Section 600-802 of the Ordinance] violate the Department of Housing and Urban Development's (HUD's) Implementation of the Fair Housing Act's Disparate Impact or Treatment Standard?

3. Has [Section 802 of the Ordinance] violated the [Fair Housing Act's] Reasonable Accommodation Standard?

4. Has the [trial court] committed an abuse of discretion or an error of law by denying Eagle Run Holdings Zoning appeal, and ruling that [Section 802 of the Ordinance] is not discriminatory either on its face or in its application in this case?

22

O.R. #13. Claims 1-3 clearly set forth Eagle Run's primary arguments concerning the application of the Fair Housing Act to this dispute, namely that the Ordinance's non-inclusion of group homes in the R-1 district is impermissible. Claim 4 indicates that Section 802 of the Ordinance is discriminatory both facially and as applied here. However, nothing in Eagle Run's statement would have put the trial court on notice that it was bound to address equal protection principles or whether the Board should have considered the two residents of Eagle Run's group home as a "family" for purposes of the Fair Housing Act. These specific issues, which are distinct from the points raised in Claims 1-3, could not be discerned from Eagle Run's statement. Moreover, we have reviewed Eagle Run's notice of appeal to the trial court from the Board's decision and its brief to the trial court in support of that appeal; these issues were not raised in those filings either. *See* O.R. #1 & #5. They are therefore waived.

### III. Conclusion

In light of the foregoing discussion, we conclude that Eagle Run failed to establish that the Ordinance's prohibition on group homes in the R-1 residential district violated the disparate impact and reasonable accommodations aspects of the Fair Housing Act. Additionally, Eagle Run waived its challenges based on the disparate treatment aspect of the Fair Housing Act, equal protection, and whether the group home's tenants constitute a family unit pursuant to the Fair Housing Act. The trial court's order denying Eagle Run's appeal is therefore affirmed.

_____
CHRISTINE FIZZANO CANNON, Judge

## IN THE COMMONWEALTH COURT OF PENNSYLVANIA

Eagle Run Holdings, LLC,      :
             Appellant      :
                   :
          v.      :
                   :
The Zoning Hearing Board      :   No. 222 C.D. 2022
of the City of Reading      :

## O R D E R

AND NOW, this 6th day of July, 2023, the February 8, 2022, order of the Court of Common Pleas of Berks County is AFFIRMED.

_____
CHRISTINE FIZZANO CANNON, Judge